## THE OREGON.

(Circuit Court of Appeals, Ninth Circuit. November 7, 1904.)

No. 1,031.

1. ADMIRALTY—SUITS IN REM—JOINDER OF LIBELANTS.

A court of admiralty may properly permit a large number of passengers to join in a single libel in rem against a vessel to recover damages alleged to have been sustained by them severally by reason of the failure to keep the vessel in a cleanly condition during a voyage, and to supply suitable accommodations and a sufficient quantity of wholesome food and provisions.

2. SHIPPING—SUIT BY PASSENGERS TO RECOVER DAMAGES—SUFFICIENCY OF PROOF.

Where a large number of libelants join in a suit in rem against a vessel to recover damages for injuries alleged to have been received as passengers from causes which are common to all, and which may be established by the same evidence in respect to the claim of each libelant, it is not essential, to sustain a decree in favor of each, that his damages should be separately proved, or that all should testify.

3. ADMIRALTY—LIBEL—VERIFICATION BY PROCTOR.

While the practice is not, as a rule, to be commended, it is not error for a court of admiralty to permit a libel in which a large number of persons join to be signed and verified by their proctor on behalf of libelants shown to be outside of the jurisdiction, and whose signatures and verification it is impracticable to obtain.

4. SHIPPING—CARRIAGE OF PASSENGERS—SEAWORTHINESS OF VESSEL.

While a carrier of passengers by sea is bound to exercise the highest degree of care, prudence, and foresight, it is not an insurer of their safety, and there is no implied warranty, as in case of the carriage of goods, that the ship was seaworthy at the beginning of the voyage; and whether she was technically so or not is immaterial in a suit by passengers to recover for injuries received. Ross, Circuit Judge, dissenting.

5. SAME—DUTY OF VESSEL TO PASSENGERS.

It is the duty of the owners of a vessel to provide suitable accommodations for her passengers, to keep her in a clean condition, and to supply her with sufficient food and provisions to meet the contingencies of accident to the vessel and the resulting delay in the voyage, from whatever cause such accident and delay may arise.

6. SAME—INSUFFICIENCY OF PROVISIONS.

It is the duty of a passenger steamer making a voyage between Nome, Alaska, and Seattle, by the outside course, which is in the open sea, without a stopping place for 1,700 miles of the way, to carry provisions sufficient for her passengers for at least 20 or 30 days in addition to the usual time required for the voyage, to meet the contingency of accident and the resulting delays.

7. SAME.

Evidence considered, and *held* to entitle passengers of a steamship on a voyage from Nome, Alaska, to Seattle, to recover damages from the owners on the grounds that the vessel was not kept clean, and that the provisions supplied were insufficient in quantity, and to a large extent unfit for food, it being shown by a preponderance of the evidence that the vessel started with provisions sufficient to last not more than from 8 to 12 days, the usual time for the voyage being 8 days; that a large part of the meat was spoiled; and that on the breaking of the rudder, which caused a delay of 10 days, the passengers were placed on a short allowance; much of the food also being in such condition that many were

¶ 5. See Shipping, vol. 44, Cent. Dig. § 533.

133 F.—39

unable to eat it, the result being that they suffered from hunger during the remainder of the voyage.

8. SAME—LIMITATION OF LIABILITY—LEGALITY.

A provision of a steamship ticket exempting the carrier from responsibility for its own or its agents' negligence, provided it has used due diligence to make the vessel seaworthy, is void, as against public policy.

9. SAME—NEGLIGENCE OF OWNERS—DEFECTIVE CONDITION OF VESSEL.

A passenger steamship was delayed during a voyage by the loss of her rudder through the breaking of the shoe or extension of the keel holding the sternpost. The vessel had been repaired in dry dock six months before, and there was testimony that the shoe, which had been re-enforced by plates bolted on either side, was then broken or cracked; but this was contradicted by the manager of the dock and other witnesses, including the government inspector, who inspected the vessel at the time, and subsequently issued the certificate required by law, and testified that she was in all respects seaworthy. *Held*, that such evidence was insufficient to charge the owner or officers of the vessel with negligence which would render her liable to passengers for damages resulting from the delay occasioned by the accident. Ross, Circuit Judge, dissenting.

10. ADMIRALTY—COSTS—PROCTOR'S FEE.

Costs in admiralty are wholly within the control of the court, and are allowed upon equitable considerations. Where a large number of persons joined in the same libel, appearing by the same attorney, and the cause of action of each was proved by substantially the same witnesses, the allowance of a proctor's fee of $10 on each claim was ample, and will not be disturbed on appeal.

Appeals from the District Court of the United States for the Northern Division of the District of Washington.

This is an action in rem, brought in the District Court for the District of Washington by 300 libelants and 58 intervening libelants against the steamship Oregon, to recover damages for injuries alleged to have been received as passengers on said steamship on a voyage from the ports of Nome and Teller, in the District of Alaska, to the port of Seattle, in the state of Washington. It is alleged in the libels that at all times therein mentioned the steamship Oregon was a carrier of passengers and freight plying in the waters of Behring Sea, the Pacific Ocean, and Puget Sound, between the ports of Nome and Teller, in the District of Alaska, and the port of Seattle, in the state of Washington; that on or about the 4th or 5th days of September, 1901, the said steamship Oregon was lying in the waters of Behring Sea, at anchor, offshore about 2½ miles from Nome and Teller, in the District of Alaska, and was advertised and was being advertised by its masters, owners, charterers, and agents in Nome and Teller as being about to sail on a voyage from said ports to the city of Seattle, a distance of about 2,300 miles, setting forth the advantages, conveniences, and accommodations offered and given to passengers upon said vessel upon said voyage. The libels recite the application by the libelants to the agent of the steamship, his representations that the vessel was in a first-class, safe, and seaworthy condition for said voyage, and that she was in all the necessary particulars well and abundantly equipped with all the necessary supplies and accommodations; that, relying upon such representations, libelants purchased tickets for transportation upon said vessel, some first-class and others second-class, and libelants were taken on board the vessel. But it is alleged that thereafter its master, owners, charterers, agents, and servants wholly disregarded and broke the promises, statements, agreements, and conditions upon which libelants purchased their tickets, and did violate and break the contract of transportation; that the said steamship Oregon left Nome, Alaska, on said voyage, on the 6th day of September, 1901:

¶ 8. Limitation of liability of vessel owners, see note to The Longfellow, 45 C. C. A. 387.

that the vessel was not at said time in a seaworthy condition, and was not in a fit condition to put to sea, and was in a wholly unsafe, dangerous, and unseaworthy condition; that the rudder of said vessel was cracked, broken, worn, decayed, and in a weak and defective condition—all of which was well known at said time to the master, officers, owners, and agents of said vessel; that when about two days out to sea from Nome the rudder upon said vessel went to pieces, and broke away from said vessel, in a perfectly calm, smooth sea, without being subjected to any unusual or severe strain; that for a period of more than ten days said vessel lay helpless in the trough of the sea, and was wholly unmanageable, and pitched and rolled violently and excessively, and to such an extent as to cause great discomfort, inconvenience, anxiety, fear, and suffering to the libelants, during all of which time the lives of the libelants were in constant peril, and said vessel was in imminent danger of being engulfed and sunk; that the master, officers, charterers, and agents of said vessel failed and neglected to supply said vessel and libelants with a sufficient quantity of food and provisions for said voyage, and neglectfully put to sea from Nome on said voyage with a small and insufficient supply of food and provisions for said voyage, and carried upon said voyage a large number of passengers in excess of the number licensed and allowed by law to be carried upon said voyage, greatly inconveniencing and incommoding libelants thereby, and failed and neglected to carry and have on board of said vessel upon said voyage, and furnish to libelants, the amount of food and provisions and water required to be carried, furnished, and provided by law; that said master, officers, owners, and agents of said vessel withheld from and failed to furnish to libelants a suitable and proper supply of good, wholesome food, provisions, or meat which libelants were rightfully entitled to, and for a period of ten days required libelants to subsist upon one meal per day, consisting of a cup of coffee and a small cracker or sea biscuit; that the food so furnished during said period was scarcely sufficient to sustain life, and for two days upon said voyage libelants were required to subsist upon two meals per day of similar food; that during the remainder of the voyage, and until the arrival of the vessel at Seattle on the 25th day of September, 1901, the food furnished to libelants was poor, unwholesome, and furnished in small, limited quantities, and was poorly and partially cooked, and the meats were in an advanced state of decomposition, and wholly unfit for food, and libelants were unable to obtain other food, and were compelled to eat such decomposed food in order to sustain life, and were driven to eat the same by starvation; that the water furnished libelants to drink was insufficient, foul, and tainted, and unfit for drinking purposes; that the officers and agents failed to keep the vessel clean, and allowed the vessel to become dirty, foul, unclean, and filthy, and to remain in such condition. The injuries alleged to have been received by the libelants are charged to have been caused by the failure and neglect of the officers and agents of said steamship to supply said vessel and the libelants with a sufficient quantity of wholesome food, provisions, and water for said voyage, and because said steamship carried upon said voyage a large number of passengers in excess of the number licensed and allowed by law to be carried on said vessel, and because the officers and agents of said vessel failed and neglected to keep said vessel clean, and allowed said vessel to become dirty, foul, unclean, and filthy, and to remain in such condition, and because they failed and neglected to furnish and provide the libelants with a fit or suitable place in which to sleep, and failed and neglected to provide the libelants with sufficient towels and bedding for said voyage, and that libelants were obliged to sleep without sufficient covering, in the rigors of a long arctic voyage, and without any suitable berths or places in which to sleep, and such as libelants were entitled to have under the tickets purchased by them for transportation on said vessel; that libelants were crowded, with a number of other passengers similarly situated, in a small, unclean, close, poorly ventilated place, in which to remain and sleep upon said voyage. The charge of the libels is that in consequence of the premises, and of the wrongful, careless, negligent, harsh, and unlawful acts of the master, officers, owners, charterers, agents, and servants of said vessel, as aforesaid, libelants suffered very great want, hunger, thirst, cold, starvation, privation, pain of body, and anguish of mind, and became and were weak, sick, and debilitated, to

their loss and damage in the full sum of $800 each in the case of first-class passengers and $500 each in the case of second-class passengers, which said sum, with costs and disbursements in the action, libelants demand of the respondent.

It appears from the record that the original libels were filed on the 1st day of October, 1901, and on the same day libelants made application to the court for permission to join in and together prosecute an action in rem against the vessel; and, it appearing to the court that the claims of each of the libelants were similar in all respects, the court granted the application, and upon the further application of the libelants to allow the libel to be verified by the oath of their proctor the court granted the application, it appearing that many of the libelants were then absent from the state of Washington, and that it would be impracticable for all the libelants to sign the libel.

The White Star Steamship Company appeared and claimed the vessel, and, answering the libelants, denied the causes of action alleged in the libels, and alleged, among other things, that libelants were received aboard said steamship under and by virtue of a written contract between each of said libelants and the claimant, which contract was contained in the ticket from Teller City and Nome to Seattle, and which ticket required upon its face that, before the same should be accepted or used, or the holder of the same be received upon said steamship, such ticket and contract should be accepted by the purchaser, and such ticket signed by the purchaser; that each of the libelants accepted such ticket, and signed the same at the bottom thereof in his own handwriting, and agreed to each, every, and all of the conditions thereof; that one of the conditions printed upon the face of said ticket and contract, and so accepted and signed by each of the libelants, was as follows: "Neither said carrier, nor the vessel, its owners, charterers or agents of either, shall be responsible for loss, death, delay of nor injury to any passenger or his baggage or property, arising from the act of God or the public enemy or perils of the sea, or negligence in the navigation of the steamer or any other vessel, * * * or from any act, neglect, or default of the shipowners' servants, whether on the steamer or not, or from any latent defect in hull, machinery or appurtenances of the vessel, though existing at the time of shipment or sailing on the voyage, or thereafter arising, provided the owners have exercised due diligence to make the vessel seaworthy. * * * Neither the vessel, nor its owners, shall be, under any circumstances, including the negligence of the owners or its servants, liable to an amount exceeding $100 for the death or delay to any passenger carried under this ticket. * * * No agent or employé has any power to modify or waive in any manner any of the conditions named in this contract." It is further alleged in the answer that at the time the vessel sailed from the ports of Teller and Nome, on the 5th and 6th days of September, 1901, the said vessel was staunch, strong, and seaworthy, completely manned, equipped, and victualed with sufficient good, clean, and wholesome food to make the regular trip from Teller and Nome to Seattle with 500 or more passengers aboard, if the same should apply for transportation, and was in all ways fully and properly prepared for such voyage; was under the command of a master with competent and sufficient officers, and with a sufficient and capable crew; that all went well with said steamship while passing through the waters of Behring Sea and until a point about 250 miles to the south of and eastward of Unimak Pass, when suddenly the rudder shoe of said steamship was broken, and it was impossible to repair the same; that, in order to preserve the propeller of said steamship and save said steamship from irreparable disaster, it became necessary to cut away the rudder of said steamship; that the same was an unavoidable and inevitable accident incident to the perils of navigation and the perils of the sea; that the same could not have been foreseen nor prevented by the claimant, or any of its officers or agents; that by reason of such unavoidable and inevitable accident, only, the voyage of said vessel from Teller and Nome to Seattle, which usually and reasonably occupied a period of seven days only, was prolonged from said natural period of seven days to a period of eighteen days; that by reason of said unavoidable accident and the perils of the sea and the prolongation of said voyage, the master of said ship, fearful that the supply of provisions thereon would run short, and the passengers on said

steamship be subjected to greater hardships, decided to carefully apportion the amount of food to be furnished to each person during the latter part of said voyage after such unavoidable and inevitable accident, and did so apportion the amount of food to be furnished to each passenger, libelants in this action; that at all times said food was good, clean, and wholesome, and sufficient for the health and comfort of said passengers, and that said passengers, libelants herein, were in no wise injured or damaged thereby, or in any other wise injured or damaged upon said voyage; that after the cutting away of the rudder of said steamship it became necessary to employ the crew of said vessel at all hours of the day and night in manufacturing and preparing a jury rudder under which said vessel might proceed to its destination in the port of Seattle, and at divers and many times it was necessary to employ the crew of said vessel otherwise than in the care and comfort of the passengers thereof for the purpose of saving said vessel from any disaster which might arise while said jury rudder was being manufactured and prepared; that at the time when the rudder of said vessel was cut away water broke into and rushed into the linen closet of said vessel, and by reason thereof it is admitted that doubtless many discomforts were felt by the passengers of said steamship, but it is alleged that each, every, and all of said discomforts were due solely to the perils of the sea arising from the unavoidable and inevitable accident to the rudder of said steamship, and could not in any wise be avoided by the claimant, or the officers, agents, or crew of the vessel. It is further alleged that the claimant, its officers, agents, and crew, did each, every, and all of the acts which could possibly have been done to avoid any inconvenience, discomfort, injury, or damage which might or could arise from the unavoidable and inevitable accident due to the perils of the sea, and that the libelants were in no wise injured or damaged as a result thereof, or in any other way upon said voyage.

The taking of testimony in the case before the United States commissioner at Seattle was commenced on October 2, 1901, and continued from time to time until March 6, 1902. The depositions and testimony of a number of witnesses were taken elsewhere, and filed as late as November 26, 1903. On December 7, 1903, the following order was made by the court upon the objection of the claimant to the taking of further testimony: "This cause having come on for hearing in open court on the 30th day of March, 1903, the claimant objecting to the libelants taking any further testimony on the grounds that the same would be cumulative, and it appearing to the court that a large amount of testimony had been taken, and that the testimony of the remaining libelants would necessarily be cumulative, the court made an order that the libelants cease taking testimony as to individual libelants, and that no further testimony be taken whatever, except as to the general conditions on said respondent vessel; to which order libelants excepted, and, said order not having been entered, it is now ordered that the same be entered nunc pro tunc as of the said 30th day of March, 1903."

From the testimony taken upon the issues raised by the pleadings, it appears that the steamship Oregon is an iron steamer, built at Chester, Pa., in the year 1878; that she is a screw propeller, and measures 1,642 tons net; that she has 58 staterooms and 227 berths, and is allowed by the certificate of inspection issued to her by the inspectors of hulls and boilers on the 17th day of May, 1901, to carry 510 passengers, namely, 227 first class, and 283 second cabin or deck or steerage passengers; that her full complement of officers consists of one master, three mates, four engineers, with nine firemen, three watchmen, and forty-one deck crew. In addition to these facts, the court below found as facts that on the 6th day of September, 1901, the steamship Oregon left Nome on a return trip to her home port, having on board 474 passengers, in addition to her officers and crew, consisting of 111 persons, including about 20 men, who, being without money to pay fare, were permitted to work their passage; that only fine weather was experienced within Behring Sea, and the vessel proceeded prosperously until she was 200 or more miles south of the Aleutian chain of islands, when the winds became stronger, and the sea became moderately rough; that in the afternoon of September 9th, the vessel having progressed as described, and the weather being moderately rough, without any jar or other indication of an accident having been noted,

it was discovered that the steering apparatus was not working properly; that, after a thorough investigation, consuming about two hours, it was found that the rudder was out of position, having settled down in the water; that then, to save the propeller, there being no sufficient tackle or appliances on the ship to correct the disarrangement or save the rudder, the fastenings were severed, and it was suffered to go adrift; that the captain and crew were efficient in meeting the emergency, and with reasonable promptness a jury rudder was constructed, by means of which the vessel proceeded without assistance to Port Townsend, and she was then towed to her destination, reaching Seattle on September 24th, being delayed in making the run about 10 days beyond her usual time; that it was afterwards ascertained that the propelling end of the ship's keel and shoe to which the rudder post was attached was broken off, and one or two blades of the propeller were also broken off; that there was no evidence that the vessel met with any trouble by grounding or coming into collision with any object afloat or aground, and no severe storms were encountered; that the mishap could only be accounted for on the theory that the shoe was inherently weak; that the shoe had been re-enforced by wrought-iron plates about 2 feet in length, riveted on each side of it, and for this purpose holes 1⅛ inches in diameter were bored through the shoe, through which bolts were driven and riveted to hold the plates, and that the break occurred on the line of one of these holes; that when the vessel was in the dock, several months previous, one of the plates mentioned was found to be fractured, and that the same plate was taken off, welded together, and replaced with new rivets.

The court found that if the shoe was broken at that time—concerning which there is a conflict of testimony—it was bad workmanship to repair a part of the ship so important as this by merely strapping the broken fragments together by such plates as are described in the testimony, and, if the shoe was not broken, then the fact that one of the plates was fractured indicated very clearly that in working the vessel there must have been such a strain as caused the shoe to spring in a manner to fracture one of the plates, and that bad judgment was used in replacing the broken plate instead of putting in a new, sound shoe of sufficient strength to serve the purpose, without any re-enforcing plates. The court found that it was not good workmanship to attach the plates by rivets for the purpose of giving added strength to the shoe, because the rivet holes necessarily impaired its strength more than the plates re-enforced it. The break occurred at the weakest place, which was in line with one of the rivet holes. The vessel being in mid-ocean at the time of the accident, without a rudder, those on board suffered from fright and anxiety, and, as it could not be known then what difficulties were to be overcome, or how long they might be adrift, every one on board was placed on short allowance of food, and for several days they suffered from hunger. The ship was not provided with a sufficient supply of food for such a voyage. There was abundance for a run of ordinary duration, but accidents and delays should have been anticipated. The stock of provisions on board was not entirely exhausted when she arrived at her home port, but she might have been delayed a much longer time, and in a few days those on board would have been reduced to the point of starvation.

The court further found that the Oregon had been out of commission for a time when she was purchased by her present owner for $63,000, and that before putting her in commission again $113.000 was expended in repairs and refitting her; that the work was done under the general directions of the United States inspectors of steam vessels for the district of Washington, so as to meet the requirements of the inspection laws, and after the work was completed she was inspected and passed by those officials, and she was also inspected by experienced and competent representatives of the underwriters; that then, after being operated successfully during one season, she was again docked and repainted, and was supposed to be in good condition, and the voyage referred to was the fourth from Seattle to Nome and return after she was in dock the last time; that her principal owner, as well as her master and chief engineer, believed that she was a good ship; that they were not chargeable with culpable negligence in the sense of having acted in bad faith, or with having failed to meet the requirements prescribed by the statutes re-

lating to the construction, repair, equipment, and inspection of passenger ships.

The court also found as a fact that the number of passengers carried on the voyage in question was not in excess of the number which the vessel was permitted by law to carry, nor in excess of the number for which accommodations were provided. The court further found that the vessel was not seaworthy when she left Seattle, owing to the weakened condition of the shoe, as heretofore described.

The court found as a conclusion of law that the libelants and interveners had legal claims to compensation, which it was the duty of the court to enforce, and therefore the court fixed the amount of damages to be awarded by the decree to each of the libelants and interveners at double the amount of fare paid, with interest thereon at 6 per cent. per annum from October 1, 1901, and a proctor's fee of $10. The total amount of the judgment in favor of the libelants and intervening libelants was $33,868.77, and costs taxed at $1,282.52. The case comes here on cross-appeals, both sides contending that the decree of the District Court is erroneous.

Richard Saxe Jones and L. C. Gilman, for appellants.

William Martin, Proctor, for appellees and cross-appellants.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The first objection urged by the appellants is directed to the action of the court in making the order allowing the libelants to join in and together prosecute an action in rem against the vessel. The court recited in its order that it appeared from the libels that the claims of each of the libelants were similar in all respects, but the controlling fact was that it was a proceeding in rem. This action of the court is sanctioned by authority. In the case of The Prinz Georg (D. C.) 19 Fed. 653, numerous libelants were steerage passengers on the defendant's vessel on a voyage from Palermo to the port of New Orleans. These libelants were all joined in one suit to recover the penalty against the vessel provided by the act of August 2, 1884, c. 374, 22 Stat. 186, and for the recovery of further damages. The claimants of the vessel interposed an exception to the libel on the ground of misjoinder of parties. The court, in overruling the exception, said:

"Where a thing is defendant and several persons are asserting rights in it, distinct, but before the same tribunal, the proceedings are, for certain purposes, necessarily to be considered together; i. e., whenever it is necessary to rank the claims or to proportion the proceeds. This would happen whenever the proceeds should be insufficient to pay all the claims in full. Again, when, as in this case, the claims rest upon a charge of a voluntary withholding of provisions, etc., the cases necessarily involve a common question, viz., whether an adequate supply of provisions was originally laden on board. The case is therefore analogous to cases of salvage or collision in this respect, and for this reason the joinder would be permissible. But I think the joinder is allowed even in cases which are in their origin distinct, and have no connection save that they are asserted against a common res. When there is a suit in rem, it is a prerequisite of jurisdiction that there should be a warrant and a seizure. In these cases there must be either the expense of 60 seizures, or there must be a joinder that one seizure may arrest for all the claims. Therefore the joinder is allowed. The difficulties of answering and defending are not enhanced, and the expense is reduced. It is for this reason, also, that the statute permits that suits separately commenced may be consolidated by the court when they are 'of a like nature or relative to the same question.' Act

July 22, 1813, c. 14, 3 Stat. 21; Rev. St. § 921 [U. S. Comp. St. 1901, p. 685]. Judge Ware, speaking of unconnected claims of materialmen, thus lays down the rule: 'Being maritime liens, there is no doubt that they may be enforced by process in the admiralty, where all may join and have their rights settled in a single suit, or may intervene for their own interest, after a libel has been filed, and have the whole matter disposed of in or under one proceeding, or one attachment, instead of having as many suits as there are creditors.' The Hull of a New Ship, 2 Ware (Dav. 199), 203, 205, Fed. Cas. No. 6,859. See, also, Judge Bett's opinion in The Childe Harold, where the same rule was followed, Olc. 275, Fed. Cas. No. 2,676. The objection is, not that the cause of each libelant is not distinctly and issuably stated, but that they are all stated in one pleading, and are, in their nature, separate causes of action accruing to distinct persons. In other suits the ruling might be very different, but in a proceeding in rem, in the admiralty, this is not irregular or unauthorized, and the exception must be overruled."

The action of the court in consolidating the numerous libels in this case was so clearly in accordance with established admiralty practice that it should be commended as eminently just and proper for all parties concerned.

Counsel for claimant contend in their last brief that they do not claim that the court was in error in allowing the libelants to join together in one libel, but that the objection was that the libelants had no community of interest, and that the damage sustained by each libelant should have been proven separately; that the court had no right to assume that the libelants who did not testify had suffered any damages whatever. There is nothing in this objection, considered from any point of view. There is no rule of law or procedure requiring libelants in admiralty or plaintiffs in any case to testify in their own behalf, and one case may be submitted upon the testimony taken in another case involving the same facts, as is frequently done. Moreover, the claimants are not in a position to raise this objection, since it was upon their objection that the court on December 7, 1903, entered an order requiring the libelants to cease taking testimony as to individual libelants, on the ground that it would necessarily be cumulative. Furthermore, the objection can only be directed against judgments entered in favor of certain libelants who are not identified or pointed out by the objection or the assignment of errors, except by the statement that a number of libelants did not testify, and a reference to the index of the testimony for the names of those who did testify. If the claimant had such objection to decrees being entered in favor of any particular libelants, he should have named them in his objection, and pointed out the insufficiency of the evidence to justify the decrees. We cannot sustain the objection as here presented.

It was next objected that it was error on the part of the court to entertain the libels verified by the proctor. It appears from the record that 155 libelants signed the libel, and severally and separately verified the same, and that the names of 145 libelants (excluding duplicate signatures), whose names appeared in the caption of the libel, were signed by the proctor, and by him verified, under an order of the court permitting such signature and verification. We do not think this practice should be encouraged, but under the circumstances of this case we cannot say that the

court was in error in making the order, upon the showing that the libelants were absent from the state of Washington, as appears from the recital contained in the order.

The pleadings present two questions upon the merits: First, whether the vessel was in a seaworthy condition when she set out on her voyage from Nome to Seattle; and, second, whether the officers and agents of the vessel were guilty of negligence in failing to keep the vessel in a cleanly condition, and to supply the libelants with suitable accommodations and a sufficient quantity of wholesome food and provisions for the voyage. The contract involved in this case is a contract for the carriage of passengers, with respect to which the carrier is not an insurer, as would be the case if the contract were for the carriage of goods. In the latter case the carrier is liable absolutely for goods lost or destroyed, unless such loss or destruction is occasioned by the act of God or the public enemy. In the former case the carrier is liable only on the ground of negligence. 2 Greenleaf on Evidence, § 222. In the leading case of Stokes v. Saltonstall, 13 Pet. 181, 191, 10 L. Ed. 115, the distinction between these two classes of contracts is stated by the Supreme Court of the United States, as follows:

"It is certainly a sound principle that a contract to carry passengers differs from a contract to carry goods. For the goods the carrier is answerable, at all events, except the act of God and the public enemy. But although he does not warrant the safety of the passengers at all events, yet his undertaking and liability as to them go to this extent: that he or his agent, if, as in this case, he acts by agent, shall possess competent skill; and that, so far as human care and foresight can go, he will transport them safely."

In the case of the Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 440, 9 Sup. Ct. 469, 471, 32 L. Ed. 788, Mr. Justice Gray, speaking for the court, refers to this distinction in the following language:

"The fundamental principle upon which the law of common carriers was established was to secure the utmost care and diligence in the performance of their duties. That end was effected in regard to goods by charging the common carrier as an insurer, and in regard to passengers by exacting the highest degree of carefulness and diligence."

Among the implied obligations assumed by the carrier of goods by sea is the warranty of the shipowner that the vessel in which the goods are carried is in a seaworthy condition when she commences her voyage. In this warranty the shipowner undertakes responsibility for any defects in the ship or her machinery or equipment, even for defects not discernible by careful examination. Carver's Carriage by Sea, § 17.

In Work v. Leathers, 97 U. S. 379, 24 L. Ed. 1012, the Supreme Court stated the rule to be as follows:

"Where the owner of a vessel charters her or offers her for freight, he is bound to see that she is seaworthy, and suitable for the service in which she is to be employed. If there be defects known or not known, he is not excused. He is obliged to keep her in proper repair, unless prevented by perils of the sea or unavoidable accident. Such is the implied contract where the contrary does not appear."

In the Edwin I. Morrison, 153 U. S. 199, 210, 14 Sup. Ct. 823, 825, 38 L. Ed. 688, the language of Mr. Justice Gray, delivering the opinion in the same case in the Circuit Court, was quoted with approval, to this effect:

"In every contract for the carriage of goods by sea, unless otherwise expressly stipulated, there is a warranty on the part of the shipowner that the ship is seaworthy at the time of the beginning of her voyage, and not merely that he does not know her to be unseaworthy, or that he has used his best efforts to make her seaworthy. The warranty is absolute that the ship is or shall be in fact seaworthy at that time, and does not depend on his knowledge or ignorance, his care or his negligence."

This statement of the rule was again quoted and reaffirmed in The Caledonia, 157 U. S. 124, 130, 15 Sup. Ct. 537, 39 L. Ed. 644.

The carrier of passengers, either by land or sea, does not assume this responsibility. Abbott's Law of Merchant Shipping (13th Ed.) p. 208; McPadden v. New York Central R. R. Co., 44 N. Y. 478, 4 Am. Rep. 705; 5 Am. & Eng. Enc. of Law (2d Ed.) 480; 6 Cyc. 591. But, instead of this warranty, he is held to a very high degree of care, prudence, and foresight. When a carrier undertakes to convey persons by the powerful, but dangerous, agency of steam, public policy and safety require that he should be held to the greatest possible care and diligence. The personal safety of the passengers should not be left to the sport of chance or the negligence of careless servants. Any negligence in such a case may well deserve the epithet "gross." Philadelphia & Reading R. R. Co. v. Derby, 55 U. S. (14 How.) 468, 485, 14 L. Ed. 502. We may therefore dismiss the question whether or not the vessel was technically seaworthy when she set out on her voyage, and confine our inquiry to the question whether the officers and agents of the vessel were guilty of negligence in overcrowding her with passengers, in failing to keep the vessel in a cleanly condition, and in failing to supply the vessel and the libelants with a sufficient quantity of wholesome food and provisions for the voyage.

We shall also defer the consideration of the question as to whether the owners of the vessel were negligent in sending the vessel to sea with a defective rudder shoe. The court below found that the vessel was not seaworthy when she left Seattle for the round voyage to Nome and return, by reason of the weakened condition of this shoe. But, as we have seen, the question whether the vessel was technically in a seaworthy condition when she set out on her voyage is not properly a question involved in this case with respect to contracts for the carriage of passengers; and the question whether the owners of the vessel were negligent in sending her to sea in a defective condition may be deferred, for the present, to consider the proximate cause of the alleged injury to the libelants, namely, the negligence charged against the owners in overcrowding the vessel, in keeping her in an unclean condition, and in failing to supply the libelants with sufficient wholesome food and provisions for the voyage; for it must be manifest that the duty of the owners of the vessel in this respect was not dependent upon the question as to whether the vessel, when she set out on her voyage, was

in a defective condition or not. It was the duty of the owners of the vessel to provide suitable accommodations for her passengers, to keep her in a clean condition, and to supply her with sufficient food and provisions to meet the contingencies of accident to the vessel and the resulting delay in the voyage, from whatever cause such accident and delay might arise.

The libelants claim that the vessel was overcrowded, and had on board about 150 passengers in excess of the number allowed by law. The vessel held a certificate issued by the inspectors of hulls and boilers at Seattle, allowing her to carry 510 passengers. There appears also to have been a permit issued by the inspectors under section 4466 of the Revised Statutes [U. S. Comp. St. 1901, p. 3045] allowing the vessel to carry 50 additional passengers, for whom standee bunks had been provided; making a total of 560. The vessel was also entitled to carry a complement of officers and crew numbering 61; making a total of passengers, officers, and crew of 621. The passenger and berth list of the vessel for this voyage was introduced in evidence, and shows the total number of passengers as 474. The agent of the vessel at Nome testified that the tickets sold for the voyage in question numbered 474. The tickets issued to the passengers by the agent at Nome were introduced in evidence, and numbered 474. In addition to these passengers, the agent testified that three or four persons were taken on board at Nome for the voyage to whom no tickets were given. There were also about 20 men who, being without means, were permitted to work their passage to Seattle. These were added to the crew, making a total number of officers and crew of 111. When the vessel reached Port Townsend, at the entrance to Puget Sound, she was boarded by Dr. L. T. Seavey, the acting assistant surgeon of the marine hospital service at that place. He testified that the captain of the vessel reported to him that he had 474 passengers and 111 officers and crew, making a total of 585. Dr. Seavey testified that he counted the number of persons on board, and found that his count tallied within a few of the number of passengers given by the captain. The difference is probably accounted for by the three or four persons taken on board without tickets. This evidence shows that the number of persons on board the vessel was about 589, or about 32 less than the number allowed by law. The libelants claim a larger number, on the evidence that a number of passengers testified that they could not get berths to sleep in, but were compelled to sleep on the deck, in the hatchways, in the dining room and social hall, and other places about the vessel. This evidence is met by the testimony that some of the passengers preferred such places to sleeping in the berths. After a careful examination of the evidence, we are unable to find testimony sufficient to justify this court in disturbing the findings of the court below in this respect.

The libelants complain that the vessel was not kept in a clean condition. This charge has for its foundation in part the lack of cleanliness on the part of many of the second-class passengers, who, coming from mining camps and other like places, probably brought

their uncleanliness with them on board the vessel. The complaint has also for its foundation the lack of proper service on the part of those charged with the duty of keeping the vessel in a cleanly condition. This charge is partly explained by the fact that after the accident to the rudder the crew was for some time kept at work upon the jury rudder, and the work of keeping the vessel clean neglected. The court below made no finding with respect to this complaint, but we are convinced from the testimony that the complaint is well founded, and should have been considered in awarding damages to the libelants. The difficulty is in determining to what extent damages should be allowed for this particular default.

The complaint that the officers and agents of the vessel neglected to supply the vessel and the libelants with a sufficient quantity of wholesome food is the most serious charge that we have to deal with in this case. And while the testimony is contradictory, and in many particulars must be grossly exaggerated, we are satisfied that the complaint is well founded. The vessel left Nome on her return voyage to Seattle on September 6, 1901. Fine weather was experienced in Behring Sea. At 8 p. m. on September 8th the vessel passed through the Aleutian Islands. Between 2 and 3 p. m. on September 9th the vessel broke down and became disabled by the loss of her rudder. The first indication of the accident was the discovery that the steering apparatus was not working properly. After a thorough examination, consuming about two hours, it was found that the rudder was out of position, having settled down in the water. To save the propeller, the fastenings to the rudder were severed, and it was allowed to drop into the sea. It was afterwards ascertained that the projecting end of the keel and the shoe to which the rudder post was attached, was broken off, and one or two blades of the propeller had also been broken off. After the broken rudder had been cut adrift, the master of the vessel proceeded to rig a jury rudder, which was completed about noon the next day. The vessel then made about 160 miles with this jury rudder, when, the weather becoming worse, it was found that alterations would have to be made in the rudder. It was accordingly taken on board for reconstruction, and while this work was going on the steamship Empress of China, on her regular voyage from Vancouver to Japan, was sighted. The Oregon had then been eight days out from Nome, and was flying the signal "want of assistance." The Empress responded to the signal, and was boarded by the master of the Oregon, who obtained from the Empress a supply of provisions and a piece of wire cable to take the place of some ropes on the jury rudder. The rudder, being reconstructed, was placed in position, and the Oregon proceeded on her voyage. Several times during the remainder of the voyage, when the sea was rough, the rudder was taken in to prevent it bumping into the vessel. The Oregon arrived at Port Townsend about 11 a. m. on September 24th. From this point she was towed to Seattle, where she arrived about 11:30 p. m. on the same day. When the injury to the rudder was discovered, or very soon thereafter, the passengers were placed on short rations. How long they were

kept on short rations, it is difficult to determine accurately from the testimony. It is certain, however, that it commenced on September 10th with two meals a day, and on September 11th with one meal, and that the one-meal ration was continued for several days, then two meals were served for a few days, and for the last two or three days three meals were served. The short rations were served for a period of 10 or 11 days. The voyage of the Oregon from Nome to Seattle, under ordinary circumstances, occupied about 8 days. On this occasion it took 18 days, or a delay of 10 days. The short rations corresponded to this period.

How was this vessel provisioned when she left Nome?

E. F. McLaughlin, a libelant, testified that he was acting as assistant butcher on the Oregon on the trip in question, working his way down from Nome to Seattle. He estimated that there was from 4,000 to 4,500 pounds of fresh meat on board when they left Nome; that they used from 1,000 to 1,200 pounds a day, and therefore had a little over 2,000 pounds on hand at the time of the accident. He testified that the condition of the ice chest was such that the meat was in the water much of the time, and became badly spoiled; that he threw out a quarter of beef about the second or third day out, because it was spoiled; that most of the meat sent up to the cook to be served to the passengers was tainted, and some contained maggots. He estimated that when leaving Nome they had 9 head of beef, 2 hogs, a little spoiled sausage, some tongues and sounds, 3 barrels of tripe, and 1½ barrels of corned beef; that one barrel of corned beef was thrown overboard, because it had spoiled. He did not know the amount of canned meats aboard.

James J. Hales, a meat cutter on the ship, testified that when he went on board there were three quarters of beef hanging at the stern, two of which were totally unfit for use; but only one was thrown overboard, the others being partly used. He stated that there were from 4,000 to 5,000 pounds of fresh meat on board, including 3 hogs and 15 sheep; that the fresh meat would have run for four or five days, serving three meals a day at the rate used for the first three days of the voyage; that after the accident they served very little fresh meat to the steerage, and sometimes none at all to any one during the day; that sometimes meat that was in very bad condition was sent to the kitchen, as he was not permitted to throw it overboard.

Frank Applebaum, assistant storekeeper, testified that he made an inventory of the provisions in the storeroom right after the accident occurred; that there were but 38 sacks of flour on board then; that it would require 75 sacks for an eight-day trip, feeding that number of passengers three meals a day; that there was some pilot bread in the forecastle, but it was very musty; that the cabin butter ran out shortly after the accident, and they had to fall back upon the steerage butter, which was very strong; that the purser told the witness they were short of stores, and must handle them very judiciously; that they wished to have some goods left when they got to port, in order to make a good showing. The witness stated that some dog salmon was found in the baggage depart-

ment, and fed to the passengers; that the salt horse was not fit to eat, a very foul smell coming from the barrels containing it. The witness received from the Empress of China 47 sacks of flour, 56 cans salmon, 6 cases corned beef, 3 sacks granulated sugar, 6 boxes tea, and 800 pounds rice.

Arthur Aylett was a waiter in the steward's department for the first-cabin passengers. He testified that there were but 50 sacks of flour put aboard in Seattle for the trip up, and that when they left Nome they had about provisions enough to feed 350 people 10 or 12 days. He had worked on Atlantic liners for many years, and stated that it was the rule on those ships to carry a three-months supply of provisions, while on the Oregon there was not more than enough to feed the number of passengers on board for eight days. He also stated that the meat was in very bad condition, and not suitable to serve.

C. H. Campbell testified that he had had experience as steward on vessels running to Nome; that the list of provisions made by the assistant storekeeper of the vessel shortly after the accident occurred would last 600 people about 7½ days. He also testified that it is usual, on vessels running to Alaskan ports, to have an extra stock of provisions on board, and that 3½ pounds of provisions per day should be allowed for each person.

R. L. Ferguson worked in the bakeshop of the steamer, and testified that on the day before meeting the steamer Empress of China they mixed cornmeal and buckwheat and all kinds of flour with the white flour to make bread; that he saw no other flour after that but the Canadian flour obtained from the Empress; that they used from 7 to 10 sacks of flour daily while he was in the bakeshop, and, in his opinion, there would not have been sufficient food if the trip had been made in seven days.

Roderick J. Marston, a second-class passenger, testified that he had followed the sea off and on for 20 years; that in ships going from London to Sydney (a 35-day voyage) they always took 3 months' provisions—hard tack, salt pork, and canned goods. He testified that he worked in the pantry on the Oregon one day after they had obtained provisions from the Empress of China, and saw very little provisions; that there were only 32 sacks of flour in the ship then, about four or five days before reaching Seattle.

Capt. James W. Connor, a master mariner of 14 years' experience, was second officer of the Oregon on the voyage in question. He testified that he was familiar with the amount of provisions required to be carried by steamships on sea voyages between New York and Liverpool; that a vessel of the size of the Oregon, when making a voyage of from 6 to 12 days' duration, would be required to carry provisions for a voyage of about 50 days, and that the supply of provisions for the Oregon on the voyage from Nome to Seattle would be required to be for at least 40 days, in the fall of the year. He also testified that on the voyage in controversy the Oregon had provisions for only 8 days.

Capt. James Carroll, a master mariner of 30 years' experience, and for many years engaged in the carriage of passengers by ves-

sel on the Alaskan coast, testified that in provisioning vessels for a voyage from Seattle to Nome he would calculate for 30 days' extra supply of provisions. These provisions would be for emergencies, and outside of the supplies required for the regular voyage. His testimony indicated that he was referring to the outside course between Seattle and Alaska, upon which the Oregon was sailing at the time of the accident.

The evidence on the part of the claimant tends to show that the vessel was provided with fresh provisions for a voyage of not to exceed 12 days.

Francis Rotch, the agent of the White Star Company at Seattle, and private secretary of S. G. Simpson, the principal owner of the stock of that company, made an estimate of the provisions required for the voyage from Seattle to Nome and return, and the amount of provisions supplied the vessel for the voyage. This estimate is as follows:

| | | |
|---|---:|---|
| 100 passengers and crew, at 1½ lbs. fresh meat per day, Aug. 24 to Sept. 6th, inclusive, 13 days | 1,950 | lbs. |
| 474 passengers and 111 crew at 1½ lbs. fresh meat per day, for estimated voyage 8 days and 2 days' emergency rations | 8,825 | lbs. |
| Total amount estimated consumption | 10,775 | lbs. |
| Received at Nome | 1,600 lbs. | |
| "       "    Seattle | 10,071 " | |
| Total received | 11,671 | lbs. |
| Balance over all estimates | 896 | lbs. |

Not including 5 doz. live fowls, 200 lbs. fish, 125 lbs. turkey, 100 lbs. chickens. In addition, smoked meats and salt meats:

| | | |
|---|---:|---|
| Bacon | 581 | lbs. |
| Hams | 638 | " |
| Salt   beef, 4 bbls. | 800 | " |
| Corned "     7    " | 1,400 | " |
| Smoked " | 35 | " |
| Salt pork, 3½ bbls. | 700 | " |
| Pigs' feet, 1½    " | 350 | " |
| Pickled tongues, 1 bbl. | 200 | " |
| Tripe, 2½ bbls. | 550 | " |
| Spare ribs, 2 bbls. | 400 | " |
| | 5,654 | lbs. |
| Fresh meats | 11,671 | " |
| Total meats | 17,325 | lbs. |
| Required for voyage | 10,775 | " |
| Surplus | 6,550 | lbs. |

W. H. Simpson, the chief steward of the vessel, testified that he had been going to sea for 23 years, and had been chief steward of vessels for 13 or 14 years, and had been on the Oregon since the July previous to the voyage in controversy as chief steward. He stated that the vessel was provisioned at Seattle, except that which was obtained at Nome; that the number of passengers on the vessel from Seattle to Nome was 7 or 8, and on the voyage coming down from Nome the number was in the neighborhood of 500;

that the fresh meat placed on board the vessel at Seattle was about 11,000 pounds; that at Nome he obtained the full carcass of a very large beef, 4 muttons, and about 200 pounds of pork loins and fresh sausage; that when the vessel left Nome there was on board between 8,000 and 9,000 pounds of fresh meat; that the amount of fresh meat required for 600 people would be 900 or 1,000 pounds per day, or a pound and a half each. He testified that they also had canned meats and fish and salt meat on board, but did not state the quantities. He further stated that the regular trip of the Oregon from Nome to Seattle never took over eight days, except the preceding one, when the vessel called at Dutch Harbor, which made the trip a little over nine days in duration. Being asked how many days' supply of provisions the vessel had for the number of passengers on board, he answered, "Well, I could figure three straight meals, full diet, for 12 days."

Capt. George Seeley testified that he issued orders relative to the selling of food on the vessel; that he told the second steward and one or two waiters that he would put them in irons, chain them to the furnace door, and burn them up if he caught them stealing an article of food. He says the vessel had ample provisions.

We think this evidence establishes the fact that the vessel was not sufficiently provisioned for the number of passengers carried on the voyage from Nome to Seattle. Between the Aleutian Islands and Puget Sound, a distance of nearly 1,700 miles, the voyage is in the open sea, without a stopping place of any kind. A vessel may become disabled on such a voyage without being able to obtain assistance for many days, or perhaps weeks. The prudence, care, and foresight required of a carrier under such circumstances is that the vessel should be provisioned, not merely for the usual voyage of 8 or 10 days, but a further period of at least 20 or 30 days, to meet the contingency of accident and the resulting delays. We are of the opinion, therefore, that the failure to so provision the Oregon was negligence.

The testimony relating to the lack of wholesome food on this voyage is shocking in the extreme; and, making allowance for exaggeration, it still remains unequaled by anything in the reports of ocean navigation of late years. The following extracts are taken from this testimony:

John N. Myers, a first-class passenger, testified that when put on short rations coffee was served in the mornings, usually without anything else, and in the afternoon a meal was served, consisting of a piece of meat, a small potato or spoonful of rice, and a slice of bread, dished out all together on a plate; that he paid for extra food at times, spending about $25 for food on the trip, and so did not suffer as much as others did from hunger.

H. C. Brown, a first-class passenger, stated that as soon as the rudder broke the food was very poorly served, and not well cooked; that the meat was spoiled, and the water was bad. His wife testified that on the third day out she became sick from poisonous food; that the meat was green, and the rice only partially cooked; that she suffered from hunger during the rest of the voyage. There is

testimony on behalf of the claimant tending to show that she was poisoned by eating stale plums which she brought on board, but this testimony is very indefinite and uncertain.

J. S. Rainey, a first-class passenger, testified that the food was so bad after the accident that he could not eat it, and was so weak that he could hardly get to the hotel at end of voyage.

James McGee, a first-class passenger, testified that for four or five days he was given only bread and coffee, with nothing else, and but one slice of bread.

Charles W. Lyke, a first-class passenger, stated that for five days he had only coffee in the morning, with no bread. His wife stated that she was faint from hunger on the voyage; that the meat was unfit to eat; and that she divided her rations with her child, as they would not give him a sufficient quantity.

Mrs. Sophia Gonzales testified that, though very ill, she could get no one to bring food to her room, and suffered greatly from hunger.

Mrs. May Collins testified that she was so weak from want of food that she had to remain in bed much of the time; that she bought food several times from the waiter, but the meat became too bad to eat when about five days out.

Samuel Myers, a first-class passenger, stated that he could not eat the food furnished; that he bought bread at $1 a loaf, and some other food, of the waiters, until one of them was put in irons.

H. D. Domar, first-class passenger, testified that the meat was very rank, and the dog salmon served, though bad, was better than the meat.

Frank Schwartz, first-class passenger, testified that he knew all the stewards, and went into the kitchen freely, and saw all the food prepared. He stated that they would have to cut off large rotten pieces from the meat, and take the rest and boil it; that it was not fit to feed to a dog; that the fresh meat obtained from the Empress of China was never put on the table, but that the witness had some of it, paying therefor $10 a steak; that he also had eggs for $5 and $6 a dozen, though none were served on the table; that he paid $3 a loaf for bread, and bought canned meats, himself and three other men spending $285 on the voyage for extra food. He stated that the women suffered so much from hunger that finally they were served with mush in the mornings in addition to the coffee, but not the men.

C. F. Dunckel also stated that he could not eat the rations served, but got along by buying extra food.

Mrs. Lomar stated that she could not eat the food given her, as the meat was green, and the coffee nauseating. She had taken some fresh eggs on board, which saved her life.

M. H. Ingersoll and Mr. and Mrs. N. H. Lillie testified that the meat was tainted, the rice uncooked, and the water bad; that the food was miserably served, and not sufficient in quantity to keep one from suffering from absolute hunger.

F. H. Herbert testified that he had to spend $80 on the trip in order to get anything that he could eat.

Mrs. Becket stated that the food was very poor; that her children were sick, and had to go without food for 48 hours, except for some crackers which she had brought, as she could obtain nothing from the stewards. Finally, upon an order from the doctor, she obtained a piece of toast for her child.

J. W. Dodd, first-class passenger, testified that he suffered from hunger many times on the trip; that not only the meat was very bad, but the chicken also; that it made his little girl sick to eat it. Mrs. Dodd testified that she was ill during most of the voyage, but could only get the same food as was served to the passengers generally, and of that she could only eat the rice and bread, which was served in very insufficient quantity.

W. F. Austin, first-class passenger, testified that he was made ill for four days on account of the bad food; that it was all bad in quality, and very little in quantity; that he paid a dollar a day for a few crackers for his wife, who was unable to leave her room. Mrs. Austin stated that the doctor said her illness was on account of the food.

B. Bemer, first-class passenger, testified that after they were out five days there was nothing but refuse of the stores left; that soup was brought to his room to him when ill which had maggots floating on it.

James Groendyke, first-class passenger, testified that the meat was bad from the day of the accident.

Mrs. G. E. Foster testified that because of tainted meat and poor cooking of other food there was danger to health; that she was poisoned by the bad food, and had to consult the ship's doctor; that she shared her rations with children and babies on board; that three days after they were put on short rations both men and women looked as if starving to death, and some were too weak to carry their small baggage when they arrived at Seattle.

W. T. Hume, a first-class passenger, testified that when they were placed on short rations no attempt was made to give decent service or properly cooked food; that friends of his were made ill by the poisonous condition of the meat, and one lady suffered serious illness from ptomaine poisoning; that the food given them was of such a character that it afforded no sustenance, and within half an hour after eating the passengers would be as hungry as ever; that sea biscuits which were furnished the first-class passengers were found to be maggoty.

George H. Woods, a first-class passenger, stated that the butcher, whom he knew, told him not to eat the meat, as it was rotten; that the chickens were blue and black when he saw them lying on blocks near the kitchen; that he could not drink the water.

Mrs. Georgie Grant and Della Beecher, first-class passengers, testified that the food was unfit to eat, and that they suffered from hunger and thirst.

I. A. Hodges, first-class passenger, declared that the meat was rotten, and the dog salmon served in its place could not be eaten by a white man. Mrs. Hodges testified that she suffered extremely from hunger and the filth on the vessel; that the little children look-

ed as bad as the starving children of India; that she had a box of provisions of her own on board, but the officers objected to her giving it to the passengers; that she did get some hot water, however, and make beef tea for the children; that one of the butchers warned her not to eat the meat, for fear she would be poisoned.

A. G. Walsh, a first-class passsenger, testified that he had to eat at the third table, and in consequence got only coffee during the entire day at times; that his stomach became so deranged from the effects of hunger and poor food on the trip that he was obliged to be under the care of physicians for a year and a half afterwards.

Charles W. Garside also testified that he was obliged to stay at medicinal springs for two months after the voyage before he was in condition to attend to business.

W. F. Burns, first-class passenger, testified that he suffered from starvation and from sickness caused by eating tainted beef.

L. L. Oie, a second-class passenger, testified that on the 11th of September they got coffee in the morning and three little sea biscuits that were very musty; on the 12th, one meal; on the 13th, 14th, 15th, 16th, 17th, 18th, 19th, and 20th, one meal, and coffee in the morning. The meal consisted of a little meat, some half-cooked rice or a potato, and one slice of bread. He became so weak he was barely able to crawl around.

Henry Larsen, a seafaring man, assisted in fixing the rudder, but became so weak from hunger that he could not stand at times.

Several of the second-class passengers testified that they helped around the kitchen in order that they might obtain food; that even in this way they suffered from hunger.

Between 70 and 80 second-class passengers testified uniformly that when put upon one meal a day the cooking was very poor, the meat tainted, the coffee unsatisfactory, and that all suffered from hunger.

James Alexander, second-class passenger, testified that he had been a butcher for 16 years, and from his knowledge the meat furnished to the passengers was rotten, and not fit to be fed to animals.

Paul Loncan, a second-class passenger, testified that he was a cook by occupation; that he helped the butcher to clean the ice box; that they took out several barrels of foul water in which the meat had been lying; that, although they took on fresh meat at Nome, it was spoiled before it was used, because of bad packing; that he did not dare to eat meat during the entire voyage, and sometimes had to wait so long for his portion of bread and potato or rice, because of standing in line to be served, that it was 5 o'clock in the afternoon before he had anything to eat.

J. L. Penny, a waiter on the steamer, testified that the meat on board was unfit for use when they left Nome; that he heard much complaint in every department because of insufficient food, and saw men picking up scraps from the refuse to eat.

James Barnes, messman for the engineers and officers, testified that the ship had not nearly as many stores on board as on the previous trip; that he helped to store the ship on both trips; that

the meats were so bad the engineers and officers would not eat them.

Many testified that they could not remain in the vicinity of the butcher shop because of the stench that came from it.

In contradiction of this testimony the claimant introduced a number of passengers as witnesses, to whom the situation on board the vessel did not appear so disagreeable. These passengers are not libelants, and have made no complaint against the vessel.

E. A. Abbott testified that the quality of the food which he received at all times was good. He saw no putrid meat, nothing but what was eatable. He had dog salmon one night, and did not fancy it very much, but ate what he had; did not consider it as good as other salmon he had eaten.

Abram A. Manning, a marine engineer of 40 years' experience, testified that the quality of the food was as good after the breaking of the rudder as it was before, but the quantity was not there. Before the breaking of the rudder he heard no fault found with the quality of the food. He states that they were five days on one meal a day, and after that they had coffee in the morning, and one substantial meal, commencing about 3 o'clock in the afternoon. The provisions were all put on each man's plate, dished out in the steward's department, and he had something to take from his meal to his stateroom nearly every time; so, if he wanted a lunch between times, he would eat it. Sometimes he had a piece of bread, and sometimes a piece of meat.

E. W. Melse, freight agent for the Pacific Clipper Line, testified that he had no fault to find with the provisions prior to the accident. After the accident the quality of the food was very good, considering the conditions. He had one meal a day, and on those days he had, in addition, a breakfast consisting of coffee and sometimes mush and crackers, and once or twice there was meat. After the jury rudder got to working, the meals were just the same as they were before the breakdown, and the quality was just the same.

Sidney G. Gale and wife were called as witnesses for the claimant. Mr. Gale had been in the employ of the White Star Company at Nome, the company that owned the Oregon. He testified concerning the meat placed on board the vessel at Nome, and other matters, but was not asked as to the quality of the food served after the accident. Mrs. Gale was interrogated upon this subject, and testified that for the first few days after the ship broke down they were put on one meal a day; that they also had breakfast, consisting, on the first few days, of coffee and crackers, and after that of oatmeal or cereals. She stated that the cooking was good, and the food in first-class condition.

S. E. Lewis, a master mariner of 15 or 16 years' experience, testified that he had no complaint to make in regard to the quality of the food; that, while they were put on rations of one meal a day, they had tea and coffee, and maybe a biscuit, in the morning, and then a regular meal in the afternoon at 2 o'clock. The meat he saw was not rotten.

Charles Livingston testified that after they were put on one meal a day the food was well cooked, with one exception. He got some rice that was not well cooked, but never any spoiled meat. Mrs. Livingston testified that the quality of the food was all right; that she had all she wanted all the way down.

Frank Muldoon testified that he did not remember that any bad or spoiled food was furnished him on the trip, except once, when he happened to get a handful of crackers that were musty, and he could not eat them. With this exception, the quality of the food was good, though there was not enough of it.

Eugene O'Connor testified that the quality of the food he received was all right, and that he got no rotten meat. The rice served to him was cooked. He did not think the food unhealthy, or that it caused any one to be sick.

David Piper, a master mariner, testified that he thought the meals very fair for that country; that the meat was all right, so far as he was concerned—the pork, mutton, and beef.

Fred Warner, a master mariner, testified that the quality of the food, both before and after the accident, was good. He suffered no great hardship from hunger.

Mrs. M. B. Reed testified to the same effect.

Reuben E. Lane, a passenger, was called, and testified concerning the number of meals served on the vessel after the breaking of the rudder, but was not asked as to the quality of the food.

These 14 witnesses were all of the passengers that were called on behalf of the claimant upon this subject. Of the ship's officers and crew, the following testified in favor of the quality of the food: John Ansell, first officer, Dr. J. Allen Harmsley, ship's surgeon, Samuel Sutton, chief engineer, W. H. Simpson, chief steward (above mentioned), James H. Close, steward, A. H. Harris and Albert Austin, cooks, A. L. Cunnington, bedroom steward, Chris Dranga, steerage steward, Fred Luckerath, waiter, B. Ogden, steerage waiter, and George G. Reis, porter.

The further fact is to be noted that about 116 passengers have not joined in this action, and have made no complaint concerning the provisions or the lack of food on board the vessel. This fact is urged as evidence that they had no cause of complaint, and, further, as evidence that no cause of complaint existed with respect to any of the passengers. But the silence of these 116 passengers cannot be so construed. Not every one who has a cause of complaint against another submits the complaint to the determination of the courts. An injured person may prefer to abide the injury in silence, rather than incur the trouble and annoyance of seeking a legal remedy. The testimony of these passengers was open to both sides, and no inference can be drawn either way. We do not know whether they considered themselves injured, or not.

The weight of testimony was clearly in favor of the libelants, and justified the finding of the court below that they were entitled to recover damages for the injuries they received in consequence of the failure and neglect of the owners, officers, and agents of the vessel to supply them with a sufficient quantity of wholesome food.

We consider the award of the court sufficient, under the circumstances, including whatever damage the libelants sustained by reason of the uncleanly condition of the vessel.

The claimant contends not only that the vessel incurred no liability by reason of any of the facts involved in this case, but that the company owning the vessel expressly contracted with each and every passenger for nonliability. This contract was contained in the conditions of the ticket purchased by each passenger. This ticket was signed by the passengers and the agent of the company, and this contract, which was expressly made a part of the ticket, provided, among other things, that neither the carrier nor the vessel, its owners, charterers, or agents of either, should be responsible for loss, delay, or injury to any passenger arising from negligence in the navigation of the steamer or any other vessel, or from any act, neglect, or default of the ship's owners' servants, whether on the steamer or not, or from any latent defect in the hull, machinery, or appurtenances of the vessel, though existing at the time of shipment or sailing on the voyage, or thereafter arising, provided the owners had exercised due diligence to make the vessel seaworthy. We have already explained that the liability of a vessel for an injury arising out of latent defects in the vessel is not implied in the contract for the carriage of a passenger, and that question is therefore not involved in this case. With respect to the other provision of the contract, relieving the carrier from responsibility for the negligence of the carrier provided he has used due diligence to make the vessel seaworthy, it is perhaps sufficient to say that this provision, if it means anything, is also inapplicable to the present case. But if, by any construction of its terms, it can be held to be applicable, it is clearly void by reason of being against public policy. Railroad Co. v. Lockwood, 17 Wall. 357, 21 L. Ed. 627; Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788; Companie La Flecha v. Brauer, 168 U. S. 104, 117, 18 Sup. Ct. 12, 42 L. Ed. 398.

In the libelant's cross-appeal numerous errors are assigned in support of their contention that the damages awarded by the District Court were insufficient to compensate them for the injuries they sustained on board the vessel. These errors relate in part to the failure of the court to find certain facts which it is claimed establish the negligence of the owners and officers of the vessel in knowingly sending the vessel to sea with a defective rudder. It appears from the evidence that the projecting end of the keel of the vessel supporting the rudder post had riveted on each side and running lengthwise with it bars of iron called "plates." The projecting end of the keel is called a "skag" or "shoe." The evidence is not entirely clear as to the purpose of these plates fastened on each side of the skag or shoe. They were on the Oregon when she was purchased by the White Star Steamship Company. Some of the witnesses seem to think that they were placed there to re-enforce or strengthen the shoe, while others were of the opinion that they were placed there to protect the shoe in crossing over bars at low water. This opinion is in a measure supported by the fact that the

plates were wider than the shoe, and extended below it, so that they would strike the ground before the shoe would. In May, 1901, the Oregon was placed in the dry dock at Quartermaster's Harbor, Seattle, for the purpose of cleaning and painting the vessel, and putting her in order for the business of the season of 1901. She was examined by the United States inspectors, the marine surveyors, the superintendent of the dock, her principal owner and other persons connected with the vessel, for the purpose of determining what repairs were necessary to place her in a fit condition for the service in which she was to be employed. It was then discovered that one of these bars alongside the shoe was broken, and it was taken off for repairs. It is claimed by the libelants that it was then discovered that the shoe was broken or cracked, and that the vessel was knowingly sent to sea with the shoe in this defective condition. The charge that the shoe was cracked or broken is positively denied by the claimant. The evidence in support of the charge is the testimony of witnesses employed in and about the vessel.

Frank E. Wing, a boiler maker's helper, remembered the steamship Oregon being in the dry dock at Quartermaster's Harbor in May, 1901. There were two plates on her skag, he testified—a plate on each side of it. One was broken, and the skag was also broken. They took off the plates, and had one of them welded up and reriveted. The keel or skag was broken clear off, and the patches of iron were put on either side. They were riveted on. These iron plates were about an inch thick and about six inches wide, the same width of the keel. One was broken at about the same place the skag or shoe was broken. The shoe was not in a safe or strong condition when the vessel left the dry dock. The way it looked to the witness, it was not seaworthy at all. The keel or shoe itself was about 4 by 5. That piece of iron was broken clear off, and the only thing that held it was the pieces of iron put on either side of the shoe. It was puttied up to make a smooth-looking job. There were several rivets along the stem that were loose, covered by the plates. These were not tightened.

William G. Sypher was also a boiler maker's helper. He testified that they took off the two plates. One was broken. They welded it up and reriveted it on. The skag or shoe under the plates was broken off. It was broken off at the same place that the plate was broken. There would be no difficulty in discovering this if a person were around there and made any examination at all. The plates covered up about four or five rivets, which were perfectly loose; could move them back and forth with his fingers for a quarter of an inch. They puttied up and painted over. The plates were not sufficient to make it safe where it was broken off.

Charles Blake, a shipbuilder, helped to take the plate or strap off, and sent it to the shop to be welded. It was broken to pieces. There was a flaw in the keel on the top, but, he says, to tell the truth, he never examined it enough to know where the crack went, whether clear through or whether it was broken underneath or not.

It was nighttime when they took it off, and he never examined it close to see whether it was cracked clear through or not.

Roy Martinalich, boiler maker's helper, worked at the dry dock. They took off a plate and put another one in its place. Saw a crack in the keel or shoe. The plates were put on to straighten the skag, which had been cracked through, to hold the two pieces together.

Elmer Sofe, a boiler maker, but who within the past several years had been following shopwork, was at Quartermaster's Harbor when the Oregon was in the dry dock in May, and saw them fixing the shoe or skag. Saw there was a crack in it, but he was not working on the vessel at the time, and could not swear to anything he was not working on. It is not the usual way to put plates on to re-enforce a skag.

H. E. Hagloff, a carpenter, was at Quartermaster's Harbor when the steamer Oregon was in the dock. Saw them patching up one of the plates—welding it. It was broken in two on the starboard side. He did not see the skag to which the plate was fastened, but saw a kind of crevice there—a little crack in the center. They filled up the holes and crevices with a kind of cement. After the vessel was cemented up and painted, the inspector could not detect those cracks, but the witness supposed that the inspector saw them before the painting was done.

John Bussanich was working at the dry dock, making rivets for the boiler maker. He testified that the skag was cracked, but how deep it ran he could not tell. There was a little crack in the corner. A patch had been put on it before. One of the plates was broken. They took it out, and put a new piece of iron on it to make it long enough, and put it back again. The work was well done on that part.

Joseph Martinalich was at the dry dock in May, 1901. Worked there half a day. Saw the Oregon, and helped to take the strap off. It was broken. The skag was cracked, but the witness pointed out a place on the diagram nearer the stern of the vessel than the other witnesses.

In support of the denial of the claimant that the vessel was sent to sea with a defective shoe, the following testimony was introduced:

Capt. George Seeley, the master of the vessel, examined the rudder shoe when the Oregon was in the dry dock in the spring of 1901. The rudder shoe was not broken. There were two plates put on that part of the rudderpost, keel, and shoe. They were continuous plates, running from the keel to the sternpost, and formed to fit the shape of the rudder shoe. They had been there for a number of years before the present owners bought the boat, when she was running on the Columbia river bar. They were put on for the purpose, as she went over the bar at low water, dragging in the sand going up the river, of preventing the chafing of the keel. Previous to the time the rudder broke down no one ever reported to the master that the rudder was out of order. No sea captain of

reasonable experience would go to sea with a broken rudder. If the shoe had been broken when she was in the dry dock, he says he would have seen it, and he saw nothing to indicate that it was broken. He did not examine the shoe in particular; had no reason to do so. Saw the vessel when she got on the dock after the accident. The shoe was broken short up to the sternpost, probably five or six inches back from the sternpost.

Samuel Sutton, chief engineer of the Oregon on the voyage in question, had been such engineer for nearly two years. The plates on the shoe had been there ever since he had known the ship. Vessels that navigate the Columbia river and the Columbia river bar are subject to an excessive wash on that part of the trip. They drag on the bar, and pieces are put on to protect them from the wash of the sand. He testified that they had fairly good weather, on the voyage in question, down to the Pass; that shoes have been known to break in all kinds of weather. It is no unusual thing for a shoe to break. When the rudder broke there was quite a heavy sea running.

Frank Walker, naval constructor, naval architect, and marine surveyor for Lloyds, was connected with the Quartermaster's Dry Dock in 1900 and 1901. The Oregon went on the dock May 6, 1901, principally for painting and cleaning. There was a re-enforcing plate on the stern frame slightly fractured, and they deemed it advisable to take it off and repair it. The nature of the fracture was principally bad welding. The witness superintended the taking of that plate off, and also the putting of it on; examined the shoe, and to the best of his knowledge it was not broken. If it had been broken, he would have noticed it immediately. He could only surmise what the re-enforcing plates were put on for. The vessel had formerly been in a trade where she had been scraping over sand bars on the Columbia river. The bottom of the keel and the bottom of the shoe had been worn to a certain extent, but nothing out of the way, and those plates had been placed on each side to re-enforce the skag. They extended below the skag, and the plates would wear, and not the skag. The witness marked on a diagram the point where the plate was welded, almost dead in the center. He saw the vessel after she broke down, in September, 1901, and examined her then as the surveyor for Lloyds' agency. The shoe was broken within about 10 or 12 inches of the sternpost proper. The last break was not within two feet of the break in the re-enforcing plate which was welded in the spring. The last break was a clean, clear, fresh break. After the repairs were made on this vessel in May, 1901, so far as stern frame, sternpost, rudder propeller, and skag were concerned, she was seaworthy. The effect of salt water upon iron is to show up the grain. It will show a lot of streaks and marks where the grain of the iron runs. An inexperienced man might think this grain in the iron was a crack. It is a very common thing. Had the skag been broken, the vessel would not have gone to sea. The United States inspectors would not allow a ship to go to sea with a broken skag. No one would have passed her.

Sol G. Simpson testified that the White Star Company owned the Oregon, and he owned all the stock of the company except two or three shares; that when the Oregon was on the dry dock in the spring of 1901 he had charge of the repairs. He took the United States inspectors up there. Previous to the return of the ship to Seattle in a broken condition, he had no knowledge of her having a broken shoe, or being in an unseaworthy condition. Did not think she was. The ship was inspected by the inspectors, and they informed him that she was in good condition in every way. He spent $113,-000 to put her in that condition after he bought her. One of the plates was taken off when she was on the dry dock. The rivets which held the plates on had corroded, and they were reriveted. The angle of one of the plates was cracked, and the inspectors said to take that plate off and weld a piece of iron in that angle and re-enforce it, and put it back again, which was done. The witness was not notified that it was fixed in an unsafe manner. The shoe was not broken.

Edwin C. Warner, manager of the Puget Sound Dry Dock Company, remembered the steamship Oregon being in the dry dock in May, 1901. The United States inspectors inspected her and directed what repairs should be made. The shoe or skag was not broken. The witness saw it himself. When a vessel is placed in the dry dock, before any repairs are made the vessel is subject to the inspection of the United States inspectors. The owners wait for the inspectors to appear, and they examine the vessel, and dictate what repairs shall be made. In every case repairs are made exactly as they dictate, because the vessel is subject to their inspection afterwards. It is customary, in making repairs of that kind, to always exceed what is known as the original construction; that is, a large factor of safety is added. So far as the stern frame, sternpost, rudder propeller, and skag are concerned, that vessel was seaworthy when she left the dock managed by the witness in May, 1901. In his opinion, an extraordinary sea struck the shoe. That that was the only explanation of the break. The plates were put on the shoe to keep the sand from rubbing on the shoe. They projected below the keel an inch and a half or two inches. There was no crack or break of any kind in the skag or shoe under the plate at the point where the plate broke. The plate was broken as near the center as possible. When the vessel broke down the skag was broken close up to the sternpost, somewhere in the neighborhood of 15 or 18 inches from the sternpost, and, counting the fillet, 12 inches. It was a fair, square break, with no sign of flaw or fracture. It was all clean.

The certificate of the inspectors was introduced in evidence. It certified that the vessel was inspected by them on May 17, 1901. The certificate is signed by William J. Bryant, Inspector of Hulls, and C. C. Cherry, Inspector of Boilers. This certificate was issued under the provisions of section 4417 of the Revised Statutes [U. S. Comp. St. 1901, p. 3024], requiring that the inspectors should once in every year carefully inspect the hull of each steam vessel within their district, and satisfy themselves that every such vessel so sub-

mitted to their inspection was of a structure suitable for the service in which she was to be employed; that she had suitable accommodations for passengers and crew, and was in a condition to warrant the belief that she might be used in navigation as a steamer with safety to life. The general rules and regulations in force at that time governing United States inspectors required that "whenever any steam vessel is placed upon the dock for repairs, it shall be the duty of the owner or agent to report the same to the board of local inspectors of that district, so that a thorough inspection may by them be made to determine what is necessary to make such vessel seaworthy, if the condition or age of the steamer, in the judgment of the inspectors, renders such examination necessary." The presumption, as well as the evidence, is that these officers performed their duties in the case of the Oregon.

Upon the testimony quoted, the District Court found as a fact that the principal owner of the vessel, as well as her master and chief engineer, believed that she was a good ship, and that they were not chargeable with culpable negligence in the sense of having acted in bad faith, or with having failed to meet the requirements prescribed by the statutes relating to the construction, repair, equipment, and inspection of passenger ships. This finding is fully justified by the evidence, and is in no way modified by the finding that the vessel was not seaworthy when she left Seattle, which finding is based upon the opinion of the court that the mishap could be accounted for on no other theory than the inherent weakness of the shoe. Moreover, the court declares what it means in finding that the vessel was not seaworthy. It says: "In all contracts of affreightment there is an implied warranty of the seaworthiness of the ship at the time of leaving port; and, although the utmost diligence may fail to detect latent defects, the carrier is not exempt from liability for damage to her cargo resulting from unseaworthiness due to a latent defect. Of necessity one party or the other must carry such risks, and the law places that burden on the owner"—citing the cases of The Rover (D. C.) 33 Fed. 515, and The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644, cases involving contracts for the carriage of goods, and not for the carriage of passengers. We do not think the evidence establishes the fact that the owner, officers, or agents of the steamship Oregon sent her on the voyage under consideration knowing that her rudder was in a defective condition.

The disallowance of a proctor's fee of $20 in each case claimed in the cost bill was correct. Costs in the admiralty are wholly within the control of the court, and are allowed upon equitable considerations. Benedict's Admiralty (3d Ed.) §§ 550–552; The State of Missouri, 76 Fed. 376, 381, 22 C. C. A. 239. The libelants all appeared by the same attorney, and the cause of action of each claimant was proven by substantially the same witnesses. In the damages awarded by the court a proctor's fee of $10 in each case was allowed, and this allowance, we think, was liberal. It was certainly sufficient. The same observation is applicable to the claim for a deposition fee of $250 for examining and cross-examining each witness.

It follows that the judgment and decree of the District Court is affirmed.

ROSS, Circuit Judge (concurring). I concur in the judgment and in the opinion, except in such portions of the latter as hold that the question of the seaworthiness of the Oregon at the time of the voyage in question was not involved in the case, and that the evidence fails to show any negligence on the part of her owner in that regard. I agree, of course, that a carrier of passengers is not an insurer of their safety; but it is just as well settled that such carrier must exercise the highest degree of care, prudence, and foresight. I agree with the court below that the evidence in the present case shows that the Oregon was unseaworthy prior to and at the time of entering upon the voyage in question, and that the condition of her rudder, as presented when she was in the dry dock in May, 1901, was sufficient to have acquainted the owner and its representatives with that fact. It is, in my opinion, the duty of a steamship company engaged in the carriage of passengers to furnish a good, staunch, and sufficient ship for the purpose, manned by a competent crew. Such was the distinct ruling of this court at the last term in the case of The City of Rio de Janeiro (In re Pacific Mail S. S. Co.) 130 Fed. 76, and is, as I understand it, the well-settled law. 5 Am. & Eng. Enc. of Law (2d Ed.) 532, 558, and cases there cited. And while it is true, as has been said, that such carriers, in the case of passengers, are not insurers of their safe carriage, they are bound to exercise the highest degree of care, prudence, and foresight, not only in fitting the vessel for sea, but in its navigation as well. Section 4493 of the Revised Statutes [U. S. Comp. St. 1901, p. 3058] in terms declared that:

"Whenever damage is sustained by any passenger or his baggage from explosion, fire, collision, or other cause, the master and the owner of said vessel, or either of them, and the vessel, shall be liable to each and every person so injured, if it happens through any neglect or failure to comply with the provisions of this title, or through some known defects or imperfections of the steaming apparatus or of the hull."