### THE STATE OF MISSOURI.

(Circuit Court of Appeals, Seventh Circuit. October 5, 1896.)

No. 295.

1. SHIPPING—LIABILITY OF OWNER FOR MASTER'S TORT—ABDUCTION—INVOLUNTARY SERVICE.

Claimants were employed by the master of a Mississippi steamer to unload freight at Helena. While awaiting payment for their services, the boat, by authority of the master, was loosed from her moorings. Claimants were forced to remain on board, and compelled to involuntary service, under threat of bodily harm if they attempted to leave. Claimants escaped at different times, and on returning home each filed his libel against the boat. *Held*, that the owner of the vessel was liable for this act of the master, upon the grounds (1) that it was breach of the contract of hiring; and (2) that it was a tort of the master, committed within the general scope of his employment. Sunday v. Gordon, Fed. Cas. No. 13,-616, disapproved.

2. COSTS IN ADMIRALTY—DOCKET FEES—SEPARATING CLAIMS.

Where separate claims and demands are filed, which could, and properly should, be united, all the causes of action being proven by the same witnesses in the same depositions, all the parties appearing by the same attorneys, and the causes covered by one final decree, it is error for the court to allow more than one docket fee provided for by statute (Rev. St. § 824).

3. COSTS—MOTION TO RETAX.

In reviewing the action of the court below in overruling a motion to retax costs, the circuit court of appeals will not consider an objection which was not specified in such motion.

Appeal from the Circuit Court of the United States for the Southern District of Illinois.

The Memphis & Cincinnati Packet Company, of Ohio, the owner of the steamboat State of Missouri, on the 11th day of October, 1895, filed its petition in the district court of the United States for the Southern district of Illinois to limit its liability under the act of congress. It charged: That the steamboat departed from the city of St. Louis on the 13th day of September, 1894, bound on a voyage to the city of New Orleans, with a large and valuable cargo of freight, and some passengers, and with a full complement of seamen or crew. That on the 19th day of September, 1894, she landed at the port of Helena, in the state of Arkansas, having then two barges in tow, laden with freight, and a large amount of freight on the steamer and barges, consigned to the port of Helena. That the master at that port employed some 38 persons named, as deck hands, for the voyage and return to the port of Helena, which employment was rendered necessary by reason of the former deck hands of the steamer having deserted while on its voyage from St. Louis to Helena. That the steamer departed from Helena on the 30th of September, 1894, with the said persons named on board, as deck hands. That immediately on going away from the wharf some of these persons demanded that they be relanded and put on shore, which the master refused to do, and afterwards that the said persons deserted the boat, one after another, until all had deserted before the end of the voyage. That on the 29th of September, 1894, the said several persons did each file his libel in the district court of the United States for the Eastern district of Arkansas against the said steamboat, alleging in substance that they were employed at Helena to unload freight from the steamer, and were to receive for their services at the rate of 25 cents per hour; that they were not, nor were either of them, a seaman or steamboat hand, but a citizen of the city of Helena, residing there, and there engaged at labor; that, when the unloading of the freight had been completed, each of the men was directed by the mate of the boat to go to the clerk's office in the steamboat, and obtain pay for the services rendered, and while there, without warning, the master of the boat ordered her departure, retaining the men on board; that they severally protested to the master and mate against being carried away, and demanded to be at once put on shore, but this the master refused to do, and, on the other hand, declared that they should go as part of the crew, and make the voyage to New Orleans and back on the steamboat; that he (the captain) was short of hands, and that none of these men should leave the boat, but should remain and perform services for the boat on the voyage, and threatened them, if they, or any of them, attempted to leave the boat they would be shot or suffer bodily harm; that the steamboat proceeded upon her voyage, omitting, however, to stop at various landings below Helena to deliver freight consigned to those places, and this through fear if a landing was made that the several libelants would escape from the steamer; that the steamboat first stopped at a place called Pushmattaha, in the state of Mississippi, some 60 miles below Helena, at which landing about 15 of the persons thus carried made their escape, and others, attempting to escape, were threatened by the master and mate and other officers of the boat with drawn clubs and pistols. Others escaped from the boat at Australia, Miss., although pursued and fired upon by the officers of the boat. They made their way back, some by steamer and some by land, without place of shelter, and so all of them, one by one, finally reached home, and exhibited their libel in the court at Helena. The steamboat, however, upon her return voyage did not stop at Helena, and has never been arrested upon process issued upon the libels, but proceeded up the river to East St. Louis, within the Southern district of Illinois. Whereupon this petition to limit liability was filed by the owner, who alleged that the injuries asserted in the several libels were done without its privity or knowledge, and without fault or negligence on its part. That the aggregate sum claimed by the several libelants in the district court of the United States in the Eastern district of Arkansas was some $76,000 or more, and much more than the value of the steamboat or her freight pending upon the voyage. The petition denied the truth of the several libels filed, and denied all legal liability to the libelants, either by the petitioner or by the steamboat State of Missouri; and the petition claimed the benefit of the limitation of liability provided by the act of congress, and prayed for the arrest of the steamboat and its appraisement, and that the

libelants might enter into bond according to the statute. Under that petition the vessel was seized, and was released upon the execution of a bond that its owner should pay into court any sum of money that might be ordered by the court, not exceeding the amount of the obligation. Thereupon a monition was issued, requiring all those named libelants in the district court of the United States for the district of Arkansas to prove their claims before a special commissioner named, whereupon 40 persons filed claims separately, all of a like character, and alleging the abduction and compulsory service on the steamboat before stated. The court at the hearing pronounced in favor of the several claimants, allowing to some $50, to others $60, to others $70, and to one $100, each; as compensation for the abduction and compulsory service which the court found to be established. The sums awarded were adjudged to be a lien on the steamboat, and the court decreed that the several parties should recover the respective sums named of the Memphis & Cincinnati Packet Company, the owner of the steamboat, and that, unless the sums of money so adjudged should be paid into the registry of the court, execution might issue in favor of the several interveners against the Memphis & Cincinnati Packet Company, the owner of the steamboat, and also against the sureties upon the bond so executed for the value of the boat; that upon payment of such sums the packet company, the owner, and the steamboat State of Missouri be discharged from further liability. The decree further provided that each of the intervening claimants should recover its costs, and the clerk taxed as costs proctors' docket fees (40 at $20) $800, and taxed, as part of the clerk's fees, commissions on $2,729.41, being the total of damages awarded, the sum of $27.29. The separate claims of the interveners were signed by the same attorneys.

C. E. Kremer, for appellant.

M. L. Stephenson, for appellee.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

JENKINS, Circuit Judge, after the foregoing statement of facts, delivered the opinion of the court.

The claimants were employed by the master to unload freight at Helena. Upon the completion of their services they were referred to the proper officer of the boat for payment. While upon that mission, the record discloses almost without disputation, the steamboat, with the knowledge and concurrence and by the authority of the master, was loosed from her moorings, and proceeded upon her voyage with these 40 colored men upon board. They were designedly abducted and purposely carried away, and thereafter compelled to involuntary service upon the steamer, because the vessel had become unable to prosecute her voyage by reason of the desertion of the former deck hands on the voyage to Helena. The liability of the owner for this act of the master of the steamer can be rested upon either of two grounds:

1. The duty was imposed upon the vessel and its master, upon completion of the contract for service in unloading the freight, to give these men unobstructed liberty and opportunity to leave the boat. That was an implied term of the contract of hiring. Failing therein, there was breach of the duty imposed by the contract of hiring. The abduction of these men was a deliberate violation of a duty imposed by the contract. The subsequent compulsory labor in the navigation of the boat, to which they were subjected, goes in aggravation of the damages arising from the breach of the contract.

2. The act was a tort of the master of the steamboat. It was com-

mitted within the scope of his employment, and in the course of doing an act of the kind which, as master, he was usually authorized to do, to wit, the employment of deck hands for service upon the boat; was incidental to the doing of that which he was authorized to do; and it was done in behalf of the owner of the boat. It is now undoubted that an act is within the scope of the servant's employment when, although it is unauthorized, it is so directly incidental to some act or class of acts which the servant was authorized to do that it may be said to be a mode, though, no doubt, an improper mode, of performing the act authorized. It is also, no doubt, true that the master's liability for the unauthorized torts of his servant is limited to an unauthorized mode of doing authorized acts, and the master is liable for the intentional misconduct of the servant if the tort be committed in the service of the master and for the benefit of the employer. Thus, a bank manager falsely represented the pecuniary condition of a customer of the bank, with a view to induce the plaintiff to give credit to such customer, which would enable the customer to reduce his indebtedness to the bank. The bank was held responsible for the fraud of the manager. Barwick v. Bank, L. R. 2 Exch. 259. The case of Craker v. Railway Co., 36 Wis. 657, contains an able and well-considered exposition of the law of respondeat superior, by the late Chief Justice Ryan. The rule in admiralty is also thus stated in 2 Pars. Shipp. 26:

"By the general rule of the maritime law, the owners of a vessel are liable for all injuries caused by the misconduct, negligence, or unskillfulness of the master, provided the act be done while acting within the scope of his authority as master."

We cannot doubt that the act here was not only one in breach of the duty under the contract which the vessel owed to these men, but that it may also be regarded as a tort committed by the master while acting within the scope of his authority, and for the benefit of the service of the master. He had authority to obtain men for service upon the boat. He could only legally do it by contract for the purpose of obtaining that service. Acting within the scope of his authority, he resorted to an unauthorized mode of procuring such service. For the wrong so done the owners of the vessel must be responsible. The case of Sunday v. Gordon, Blatchf. & H. 569, Fed. Cas. No. 13,616, holds, it is said, a different doctrine. This case was decided in 1837 by Judge Betts, of the Southern district of New York. There the libelant claimed to have shipped at the coast of Africa, as seaman, on board the brig Packet, of which the respondent was owner, for a voyage to the port of Liberia, in Africa, at which place he was to be set ashore. The master therein failed, and, in violation of the contract, brought the libelant, against his will, to the port of New York. He was assured by the master and owner that the brig was loading for the voyage back to Africa, and he should be returned to the port of his residence and nativity. The vessel sailed, but in fact for a port in Morocco, whence it returned to New York without going to the place of the libelant's residence, and without sending him home or permitting him to leave the brig. Judge Betts ruled that, if the

libelant was tortiously brought off from Africa, that was exclusively the act of the master, but found as a fact that he was employed by the master, not as a seaman, but solely for the master's individual comfort and assistance. It may be said of this case that it announces doctrine which cannot at this time be sustained, and that the rule is now well established that the owners of a vessel are liable for the torts of the master done in the execution of the business in which the boat is engaged. Taylor v. Brigham, 3 Woods, 377, Fed. Cas. No. 13,781; Gabrielson v. Waydell, 67 Fed. 342. In the latter case, comment is made upon the case of Sunday v. Gordon, and it is sought to be distinguished, in this: that the act of the master was begun wholly outside of the ship, and was perpetrated upon one not connected with the ship, but who was wholly outside of the business of the ship and of the master's agency or office. But, whether the case can be so distinguished or not, we are not prepared to assent to the doctrine that the master is not liable for the tort of the servant, done in the service and for the benefit of the master, and with respect to a matter within the scope of the servant's employment.

It is urged that the damages awarded were excessive and punitory in their character. Undoubtedly the damages to be awarded must be compensatory, and not exemplary, where recovery is sought against the master for the unauthorized tort of the servant; but we cannot say that the damages here are other than compensatory, nor are we able to say that they are at all excessive, viewed as compensatory damages. It is true that these men were in a low station of life, and possibly with feelings not so refined and acute as those of the more cultivated and educated classes of society. It cannot be doubted that, in actions for personal tort, mental suffering, vexation, and anxiety are subjects of compensation in damages. These men were taken away against their consent. Their families, if they had families, were left in ignorance of their whereabouts. Their rights as American citizens were infringed. They were deprived of their liberty. They were put to involuntary service. They were oppressed and treated with indignity while upon the boat, and at least one of them was fired upon while attempting to make his escape from the boat. They were obliged, upon escape, to make their way homeward as best they could. We are of the opinion that the court below dealt with this matter of damages in a conservative spirit, and with discriminating sense. If the master of the steamboat, instead of its owner, was here to respond in damages, he might properly be mulcted in exemplary damages for this deliberate invasion of the rights of citizenship.

The decree of the court awarded the claimants "all their costs by them respectively herein expended." The 40 claimants appeared by the same proctors. The clerk taxed the sum of $800 for proctors' fees, being $20 upon each of the 40 claims. A motion to retax was overruled by the court, and that ruling is assigned for error. These cases could all have been presented by one petition. The proofs were not taken in each case separately. There were but 11 depositions, which covered all the testimony affecting all the claims. The statute (section 824, Rev. St.) provides that on a final hearing

in equity or admiralty a docket fee of $20 may be allowed. Costs in the admiralty are wholly within the control of the court, and are allowed or denied upon equitable considerations. They are sometimes denied to one who recovers his demand, and are sometimes given to a libelant who fails to recover anything, if he was led to commence suit by the act of the other party; and in prize and salvage cases the property is sometimes acquitted on payment of the costs by the claimant. The general rule is that costs follow decree, but circumstances of equity, of hardship, of oppression, or of negligence induce the court to depart from the rule in many cases. Ben. Adm. § 549. The court below manifestly proceeded upon the ground that each party was absolutely entitled to the statutory docket fee, and seems not to have exercised its discretion in the matter. We think it would be oppressive in this case to sustain this allowance of docket fees. The total damages awarded amount to about $2,700, and the total proctors' fees to $800, or nearly 30 per cent. of the total damages. To sustain such taxation is to sanction the filing of separate claims and demands which could be, and should properly be, united, and when, as in this case, the cause of action of each claimant is proven by the same witnesses in single depositions. These parties all appeared by the same attorneys. The causes in fact proceeded as one, and were covered by one final decree. That separate claims were filed, when they could have been and ought to have been presented in one claim, might warrant the suspicion that this unnecessary procedure was taken to improperly multiply the costs taxable in the suit. We think that the court below was in error in allowing more than one proctor's fee upon final decree for the claimants.

It is objected that the clerk improperly taxed an item of $27.29 for receiving, keeping, and paying out the amount awarded the claimants, when that amount had not been paid to the clerk, and that the same is not properly taxable until the clerk has at least received the amount. This objection may be well taken, but it was not specified in the motion to retax costs, nor in the assignment of errors, and cannot therefore be considered. The decree will be reversed and the cause remanded, with directions to the court below to enter a decree for the damages heretofore found, and for proper costs, which shall include but one proctor's fee of $20.