339 F.2d 148
 FIREMEN'S FUND INSURANCE COMPANY et al., Appellants,
v.
STANDARD OIL COMPANY OF CALIFORNIA et al., Appellees.
The CITY OF LOS ANGELES, Appellant,
v.
FIRE ASSOCIATION OF PHILADELPHIA et al., Appellees.
YACHT CENTRE, INC., et al., Appellants,
v.
STANDARD OIL COMPANY OF CALIFORNIA et al., Appellees.
The CITY OF LOS ANGELES, Appellant,
v.
D. R. GUSTAVESON et al., Appellees.
GREAT AMERICAN INSURANCE COMPANY et al., Appellants,
v.
STANDARD OIL COMPANY OF CALIFORNIA et al., Appellees.
 Nos. 18404-18408.
 United States Court of Appeals Ninth Circuit.
 Nov. 30, 1964.
 
 Roger Arnebergh, City Atty., Arthur W. Nordstrom, Asst. City Atty., Walter C. Foster, Deputy City Atty., and Trippet, Yoakum & Ballantyne, Los Angeles, Cal., for appellant City of Los Angeles, Cal.
 Frederick B. Belanger and Schell & Delamer, Los Angeles, Cal., for appellee Ben C. Gerwick, Inc.
 Philip K. Verleger, John Lawrence Leary, McCutchen, Black, Verlerger & Shea, Los Angeles, Cal., for appellees and cross-appellants Fireman's Fund Ins. Co. et al.
 Before BARNES, HAMLEY and BROWNING, Circuit Judges.
 BARNES, Circuit Judge:
 
 
 1
 These are five admiralty actions consolidated for trial, and on appeal. Appellants are individual boat owners and various insurance companies who had paid for damage to, and 'clean-up' of, various private pleasure yachts, which had been anchored in Los Angeles Harbor, primarily in and about the Yacht Centre, Inc. This corporation occupied harbor space pursuant to a lease granted by the Board of Harbor Commissioners of the City of Los Angeles (hereinafter the 'City'). The damage occurred as a result of an 'oil spill' which itself occurred in the following manner.
 
 
 2
 On July 11, 1957, oil (pumped by Standard Oil Company of California to Matson Terminals through a 9,600 foot pipeline built by Gerwick, Inc., a corporation, for the City of Los Angeles, and accepted and operated by the City) spilled into the Los Angeles Harbor-- some 1,400 barrels of it.
 
 
 3
 We will not go into a detailed discussion of the factual situation surrounding the building of the line, but mention only the necessity for some type of expansion joint at a certain spot therein to allow for expansion and contraction of the pipeline; the insufficient space (3 1/2') between two required pipe straps (Ex. F) to permit the installation of an expansion joint; the substitution of a coupling device, known as a 'Dresser Style 38 coupling'; the dispute as to whether this substitution was authorized, and if it was, whether or not it was authorized in writing and by whom; the failure of the substitute for the expansion joint to stand two hundred pounds pressure on two occasions; the addition of 4 X 4 inch timbers to hold the coupling by wedging such timbers against the line; the trial run of 400 pounds pressure; the Harbor Engineer's instructions to remove the timbers; the written advice to the Harbor Engineer that these timbers had been removed; that some permanent blocking had to be inserted before the line could be safely put into use; and the subsequent acceptance of Gerwick's work as 'fully and satisfactorily completed.'
 
 
 4
 Jurisdiction below existed by reason of 28 U.S.C. 1333, and Article III, 2 of the United States Constitution. Jurisdiction here exists by reason of 28 U.S.C. 2107.
 
 
 5
 In No. 18404, some twelve insurance companies sued, as subrogees of small boat owners, the City. The Standard Oil Company of California, a corporation, which pumped the oil in; Ben C. Gerwick, Inc., a corporation, which constructed for the City the pier extension and pipeline involved; Dresser Industries, Inc., a corporation, which manufactured the coupling used by the contractor; Matson Navigation Co., a corporation, to which the oil was to be delivered for the 'S.S. Lurline'; and C. E. Keiser, Sales Engineer for Dresser Industries.
 
 
 6
 In No. 18405, one insurance company, as subrogee of a small boat owner, sued the same defendants above named.
 
 
 7
 In No. 18406, the Yacht Centre, Inc., a corporation, the yacht mooring facility, sued the same defendants above named.
 
 
 8
 In No. 18407, eight small boat owners sued the same defendants above named.
 
 
 9
 In No. 18408, one insurance company, as subrogee of small boat owners, sued the same defendants above named.
 
 
 10
 In each action, the City filed claim against Gerwick for clean-up expenses, indemnity and contribution.
 
 
 11
 The trial court found against the City in favor of all plaintiffs, and against the City on its claim for indemnity and contribution.
 
 
 12
 In that connection, we quote in the margin Findings (24), (25), (26) and (27) in case No. 18408.[1] Similar findings were made in each of the other actions.
 
 
 13
 The amount of damage of the respective plaintiffs was agreed upon by stipulation.[2]
 
 
 14
 The district court concluded the City of Los Angeles was liable for its negligence in building and operating the oil line, and denied recovery to the City, both for (a) indemnity or contribution, and (b) damages for clean-up expense sought by it from Ben C. Gerwick, Inc. A minor point is raised in this appeal by the City involving deposition costs.
 
 
 15
 We find no merit in the City's appeal on any point.
 
 
 16
 I-- The Appellees' Status.
 
 
 17
 The sole ground of the City for claiming nonliability is that the City owned the harbor and its waters and hence had only a duty to refrain from active negligence, and to warn of defective conditions, and that plaintiffs failed to show any status that created a duty of care to them which the City had violated.
 
 
 18
 We reject such contention.
 
 
 19
 The City had no right to exclude citizens of California from using navigable waters. (R.T. 1417-3). It holds title to land covered by navigable waters in trust, by grant from the State of California, upon the express condition that 'any harbor constructed thereon shall always remain a public harbor for all purposes of commerce and navigation' and with an express reservation that the people of the State of California have 'the absolute right to fish * * * with the right of convenient access * * * over said (submerged) lands.' And cf. Art. XV, 2 of the Constitution of the State of California.
 
 
 20
 Several of the boat owners were business invitees of the Yacht Centre, Inc., and by reason of its lease with the Board of Harbor Commissioners, were, with it, business guests or invitees of the City-- not licensees or trespassers as the City apparently urges. The cases cited by the City do not support their position, on the facts here present. In Chinca v. United States, 190 F.Supp. 643 (N.D.Cal.1961) for example, plaintiff was in the class of one 'who comes upon another's land' for a 'non-business purpose of benefit only to himself' and was hence a licensee. We cannot assume that either the boat owners or the Yacht Centre were invited by the City to use their anchorage or slip space without cost to the shipowners. There existed a resulting advantage to the City in the way of income. We cannot believe the boat owners using the anchorage were the 'unforeseen vessels' mentioned in The Chancellor, 30 F.2d 227 (2 Cir. 1929); and hence trespassers. The City here had erected small slips, regularly leased to various tenants (R.T. 1425, 1437) and permittees (R.T. 1432). Thus, contrary to the City's position, there was evidence of the status of the plaintiffs. Additionally, there was a finding (No. 18) that there was no evidence that the damaged vessels were not rightfully in the harbor at the time they were so damaged.[3]
 
 
 21
 Thus the lack of factual basis for the City's legal position eliminates any reliance on its first point on appeal. This is the sole point on this appeal raised against the appellee insurance companies and/or boat owners.
 
 
 22
 II-- The Executed Oral Agreement.
 
 
 23
 The City next claims that Ben C. Gerwick, Inc., is liable to the City for damages resulting from the separation of the defective pipeline, and for indemnity paid by the City, if liable.
 
 
 24
 This position is based on the theory that the written contract, plans and specifications for the construction of the pipeline could not be lawfully altered by an oral executed agreement.
 
 
 25
 That there was an alteration in the original plans to insert some form of 'joint' is not disputed. The court found that Gerwick had constructed the wharf in all respects in accordance with the contract, plans and specifications, and 'duly authorized oral executed alterations, modifications, deviations and changes.' (Finding 21.) But, the City urges, the court (1) made no finding as to the identity of the person who was authorized to enter into an oral agreement on behalf of the City; (2) the contract itself provided (Ex. CA, p. 15, Art. 31) that the Harbor Engineer's authority was limited to 'minor changes'; (3) those were required to be in writing (Art. 31); and (4) only changes 'necessary or expedient to carry out and complete more fully and more perfectly the work agreed to be done' could be made.
 
 
 26
 It is conceded by the City that Tingley, Gerwick's project engineer, testified he had a telephone conversation with one Squires, chief of the design section of the Harbor Engineer's office, wherein Squires authorized a Dresser Style 38 coupling (Finding 25(b)). Subsequently, Jackson (the City's Inspector) allegedly laid on Tingley's desk a note which read: 'Use Style 38 coupling.' This is not an expansion joint, but is what was installed between bents Nos. 221 and 222.
 
 
 27
 We here refer to and adopt partially the statement of facts set forth in the margin[4] made by appellees and certain cross-appellants. Each is supported by a finding or reference to testimony.
 
 
 28
 To the foregoing recital of facts in note 4, we add the fact conceded by the City in its brief that on November 1, 1956, E. V. Dockweiler, the Harbor Engineer, wrote a letter to Bernard J. Caughlin, general manager of the Harbor Department, stating that Gerwick had fully and satisfactorily completed the work under the contract, except for certain paving, and had complied with the terms of the contract. This report was approved by the general manager (of the Harbor Department) and by the Board of Harbor Commissioners. (Ex. EC.)
 
 
 29
 Despite the findings of the district court that Gerwick had performed the work in accordance with the orally executed changes; despite the admitted ambiguity in the drawings prepared by the City (Appellant's Op.Br. p. 6, Ex. F, R.T. 324, 328) that called for building something that could not be built; despite the discrepancies between various plans the City prepared (Ex. E and F); and even despite the provisions of the contract (which, recognizing that discrepancies might exist, required the contractor to submit the matter to the engineer--'without whose decision said discrepancy shall not be adjusted'-- (Ex. CA, p. 16, Art. 38)), the City now urges that we disregard Tingley's testimony that he followed the required procedure; disregard the trial court's findings based on conflicting testimony, and conclude that Gerwick, not the City, 'failed to perform the contract, plans and specifications in a workmanlike manner.'
 
 
 30
 That the contract was required to be modified was obvious. That it may be likewise seems good law.
 
 
 31
 "Any contract, however made or evidenced, can be discharged or modified by subsequent agreement of the parties. No contract whether oral or written can be varied, contradicted or discharged by an antecedent agreement." Hotle v. Miller, 51 Cal.2d 541, 546, 334 P.2d 849, 851 (1959) (quoting 3 Corbin on Contracts, 574, pp. 222-23).
 
 
 32
 California Civil Code 1698 provides that a contract in writing may be modified 'by a contract in writing, or by an executed oral agreement.'
 
 
 33
 'The parties (to a construction contract), may, by their conduct, waive such a provision (requirement of written change order). * * *' Frank T. Hickey, Inc. v. Los Angeles Jewish Community Council, 128 Cal.App.2d 676, 682-83, 276 P.2d 52, 57 (1954).
 
 
 34
 As to the applicability of 1698, Civil Code of California, in this connection, see 1st Olympic Corp. v. Hawryluk, 185 CalApp.2d 832, 8 Cal,Rptr. 728 (1960) and Miller v. Brown, 136 Cal.App.2d 763, 289 P.2d 572 (1955).
 
 
 35
 The City, say appellees, stands in no more favored position than any other suitor. Brown v. Sebastopol, 153 Cal. 704, 96 P. 363, 19 L.R.A.N.S., 178 (1908); Corporation of America v. Durham Mut. Water Co., 50 Cal.App.2d 337, 123 P.2d 81 (1942).
 
 
 36
 With respect to the oral executed agreement, appellant City urges in its reply brief the proposition (a) that the Charter of the City of Los Angeles provides in 385 that 'Contracts of the City of Los Angeles are required to be in writing,' and (b) that contracts required by statute to be in writing cannot be modified by oral executed agreements, citing Lisher v. Fairbanks, 70 Cal.App. 326, 233 P. 74 (1924); Contra Costa Const. Works v. Daly City, 48 Cal.App. 622, 192 P. 178 (1920); Rice Lands & Products Co. v. Blevins, 61 Cal.App. 536, 215 P. 402 (1923); J. M. Griffith Co. v. Los Angeles, 6 Cal.Unrep. 119, 54 P. 383 (1898).
 
 
 37
 Gerwick replies (a) that California Civil Code 1698 and various cases cited at pages 18-19 of the appellees' brief, support the validity of oral executed agreements, (b) that Charter 385 was never introduced into evidence or relied on in the court below; (c) the four cases the City cites, supra, are not controlling.
 
 
 38
 At oral argument the City was granted permission to file authorities supporting its position that a court can and will take judicial notice of the charter of a municipal corporation, namely: Par. (g), Sec. 8, Art. XI of the California Constitution; Teachout v. Bogy, 175 Cal. 481, 485, 166 P. 319 (1917); Taylor v. Los Angeles, 180 Cal.App.2d 255, 4 Cal.Rptr. 209 (1960).
 
 
 39
 After adoption of a city charter in California and after proper recordation as required by Art. XI, 8, Par. (g): 'the courts shall take judicial notice of the provisions of such charter.' We are not advised that there was proof of such proper recordation in the trial court. Neither are we convinced 'the courts' required to take notice include those of the federal system.[5] But we need not decide that matter, because we find the issue controlled by case law.
 
 
 40
 The Lisher Rice Lands, Contra Costa Construction and Griffith Co. cases, all cited, supra, do not go as far as counsel for the City would have us believe, in defeating the language of 1698 of the California Civil Code.
 
 
 41
 Thus, in Contra Costa, the court does not say that contracts required by statute to be in writing cannot be altered by an oral executed agreement. 'An implied contract,' the opinion states (70 Cal.App. at 625, 192 P. at 180), 'in this case could not arise at least without knowledge or action on the part of the board of trustees before the extra work was done,' citing the Griffith case. In the instant case, both knowledge and action on the part of the Board of Harbor Commissioners existed. These did not exist in Contra Costa, where the judgment was simply 'not supported by the evidence.' (p. 625, 192 P. 178)
 
 
 42
 In Griffith, supra, the City was held not liable as upon a quantum meruit for work authorized by the engineer alone, unknown to the city counsel, for steel bands claimed against the City after the sewer was unbedded below the surface of the earth.
 
 
 43
 We have already commented on the material facts here present, which distinguish this case. We agree with appellees that the four cases relied on by the City are not controlling. Cf.: Miller v. Brown, 136 Cal.App.2d 763, 289 P.2d 572 (1955); 1st Olympic Corp. v. Hawryluk, supra; and re estoppel, see Maurice L. Bein, Inc. v. Housing Authority, 157 Cal.App.2d 670, 321 P.2d 753 (1958); Corporation of America v. Durham Mutual Water Co., 50 Cal.App.2d 337, 123 P.2d 81 (1942).
 
 
 44
 Because the City here does not raise any question with respect to its own negligence (save as to the status of the small vessel owners to sue), we accept the findings of the trial court that the defects in the pipeline, its failure, the oil spill, the damage to libellants, and the damage, if any, to the City, caused by such spill, were proximately caused by negligence on the part of the City, and by its negligence alone.
 
 
 45
 Because we have upheld the trial court's conclusion and finding that there was an oral executed agreement altering the original contract, and that Gerwick faithfully performed the work required by the contract as so modified, we find there were no improper methods used by, nor any negligence proved on the part of, the contractor. Hence there is no liability on Gerwick to the City on any agreement of indemnity. Vinnell Co. v. Pacific Elec. Ry., 52 Cal.2d 411, 340 P.2d 604 (1959). To put it succinctly, we can find neither an express nor an implied indemnity under the facts here present rendering Gerwick liable for what occurred.[6] Gerwick had no control over the pipeline once it was delivered to the City. The City knocked out adequate trussing (found so by actual test) and installed its own inadequate trussing. This failed nine months later-- and the City's continuing negligent nonaction constituted subsequent intervening causation, even had Gerwick been negligent.
 
 
 46
 III-- Costs of Depositions.
 
 
 47
 Lastly, the City urges error in one of the actions (No. 18404) in the allowance of five proctors' fees for depositions not introduced in evidence; the witnesses being present and having testified in court; and the depositions having been used either to refresh recollections, or in connection with cross-examinations.[7]
 
 
 48
 The City relies on Prashker v. Beech Aircraft Corp., 24 F.R.D. 305 (D.Del.1959). In that case, the trial judge pointed out that 28 U.S.C. 1923 provides that docket fees of $2.50 are allowable 'for each deposition admitted in evidence.' It ruled seven of the ten deposition docket fees sought were for depositions not introduced into evidence, and there was 'no sufficient support' to establish they were used as evidence either in cross-examination or otherwise. The court disallowed the cost of the seven ($17.50), stating:
 
 
 49
 'It is obvious I am not passing on depositions where portions were expressly utilized in evidence as held in Perlman v. Feldmann, D.C., 116 F.Supp. 102 or Lindeman v. Textron, Inc., D.C., 136 F.Supp. 157.' Id. 24 F.R.D. at 307.
 
 
 50
 In the oft referred to case of Perlman, supra, the court allowed as taxable the cost of one copy of five pre-trial depositions-- which he found were 'necessarily obtained for use in the case.' This was his ruling, 'having in mind the objective of the pre-trial discovery provision of the Federal Rules,' and the provisions of Rule 26(a). He held 'the cost to a prevailing party of the copy of a deposition transcript is implicit in 28 U.S.C. 1920(2)' (116 F.Supp. pp. 109, 110). None of the depositions were filed (116 F.Supp. at 111). The court concluded that filing had been waived, and the costs allowable.
 
 
 51
 The Perlman case, supra, does not meet the question of the effect on taxability of costs of deposition where the depositions are or are not used at the trial; nor on taxability as docket fee costs under 1923, as distinguished from ordinary costs. The Lindeman case, supra, does, and holds that at least some excerpt from any deposition for which a docket fee is claimed must have been introduced into evidence.
 
 
 52
 Turning to the factual procedural situation in this case, we find that appellant City concedes 'These depositions were used for the purpose of refreshing the witnesses' recollections and were used in connection with their cross-examination.' (Op.Br. p. 35.) This brief refers us to the Clerk's Transcript in No. 18404, pp. 262-63, and 264-65. The first reference is to a stipulation between the parties, showing that of the twenty depositions originally 'docket fee taxed,' portions of depositions of five witnesses not present were read into evidence; portions of five depositions of (other and additional witnesses) were used to refresh recollection and to cross-examine, and none of ten (other and additional depositions of witnesses)[8] were read or admitted into evidence, nor were they used to either refresh recollection or cross-examine a witness who testified.
 
 
 53
 Appellee libellant insurance companies filed a cost bill in the sum of $3,835.45. This was taxed by the court clerk at $216.86, and subsequently on hearing by the trial court, retaxed at $191.86 ($45.00 instead of $70.00 for docket fees under 28 U.S.C. 1923, a deduction of $25.00 or ten 'deposition docket fees' of $2.50 each).
 
 
 54
 As did Chief Judge Hincks in Perlman v. Feldmann, supra, we agree that the logic of the case of Stallo v. Wagner, 245 F. 636, 639 (1917), decided by the second circuit in interpreting the old Fee Bill of 1853 (Rev.Stat. 983; 28 U.S.C. (ed. 1940), 830) was superseded by 1920(2) of 28 U.S.C., which the revisers, 'with congressional approval,' doubtless intended to make broad enough to incorporate the substance of subdivision (e) of the Court Reporter's Act of 1944, 28 U.S.C. (ed. 1940) 9a; that this was carried over into the Code of 1948, 28 U.S.C. 1920(2), and hence falls within the 'necessarily obtained for use in the case' rule. If not taxable as proctor's docket fees, it was taxable as necessary costs, and we will not disturb for form where substance does not require it.
 
 
 55
 IV-- The Cross-Appeal.
 
 
 56
 A. Libellant insurance companies appeal the refusal to allow them interest from July 11, 1957, the date of the oil spill (or in the alternative, from October 10, 1957, the stipulated date of payment of the subrogated insurance) until May 2, 1962, the date of the final decree.
 
 
 57
 This, cross-appellants urge, was an abuse of the court's discretion for a loss in admiralty, citing The President Madison, 91 F.2d 835, 845-46 (9th Cir. 1937); The Manhattan, 85 F.2d 427, 429 (3d Cir. 1936). Cross-appellee City cites the same cases to prove that such interest is not a matter of right, but within the legal discretion of the trial court. We note that the trial court found:
 
 
 58
 'That there has been no unnecessary or unreasonable delay by any libellant herein in filing this action or in prosecuting it through trial.' (Finding 38.)
 
 
 59
 In his conclusions of law, the trial judge struck out the typewritten reference to an award of interest at seven per from July 11, 1957 to date of payment, and awarded interest 'from the date of entry of the decree to date of payment,' with costs. (Clk's Tr. p. 240, No. 18404.)
 
 
 60
 In The President Madison, supra, Judge Denman for this court (91 F.2d at 845) pointed out that where there had been a total loss of a vessel, it 'cannot be fully compensated by payment years after of no more than her value at her sinking or destruction. (for) the owner has neither use of the vessel nor her money equivalent during this period.'
 
 
 61
 We note that most of, if not all, the cases cited by Judge Denman are 'total loss' cases; 'Restitutio in integrum' is to be paid, unless refused under the 'peculiar facts' of the case. Some examples (usually of counsel's delay) are given. But, says the opinion, if there are 'peculiar facts' causing denial of interest from the date of the collision, there should be findings made to that effect. Here there were no such findings; in fact, the findings of fact made (Finding 38) indicated that no such 'peculiar facts' here existed.
 
 
 62
 In The Manhattan, supra, again the loss was total, at least 'in the money value sense.' The court there said the trier of fact was required to assess damages 'precisely as a jury would render a verdict in a personal injury case.' (85 F.2d at 428) The court then considered the date from which 'interest allowance' is calculated.
 
 
 63
 'Until an award is made of the damages, interest qua interest is not allowed, but delay in making compensation is an element in determining the damages. * * * Delay thus enters into the late award as an element of loss, and the damage awarded is for a sum which is the equivalent of what would have been a smaller sum if earlier awarded. The difference between loss and interest thus becomes little more than a difference in words, but it none the less exists in theory.' (Id. at 429.)
 
 
 64
 Suggesting that any rule must be subject to the check of common sense (85 F.2d at 428), and in an attempt to turn the light of common sense on the facts of this case, we find (1) that apparently none of the respective losses were total; (2) that the parties stipulated to the damages the libellants had suffered, in a somewhat inexplicit manner;[9] (the so-called 'actual damages' were themselves arbitrary figures, being sixty-two per cent of damages claimed by libellants (Clk's Tr., p. 146, No. 18404)) (3) that there was no proof in the record of when repairs were made or cleaning was done, or that repairs had actually been made, or that libellants had suffered any loss of use of their vessels. Neither was there any proof in the record of the respective condition of the vessels prior to July 11, 1957.[10] The trial court, having these factors in mind, including the stipulation as to damages, awarded what it concluded was fair compensation.' So that there could be no misunderstanding or charge that delay on the libellants' part had entered into or influenced his conclusions, he made Finding 38.
 
 
 65
 We think the stipulation as to 'actual damages' made herein, plus the record (or lack of it) found herein, justified the discretion exercised by the trial court in awarding interest only from the date of entry of judgment.
 
 
 66
 That this is not a 'total loss' case is not conclusive; neither is the fact that it was not a 'collision loss.' We think that the reasoning with respect to interest in The Tanker Hygrade No. 24, Inc. v. The Tug Dynamic, 233 F.2d 444, at 447-48 (2d Cir. 1956), supports our conclusion, in the absence of any proof in the record of deprivation of use.
 
 
 67
 Under the peculiar facts of this case we decline to follow the procedure followed by this court in The President Madison, supra, 91 F.2d at 847-48, and we confirm the exercise of the trial court's discretion.
 
 
 68
 B. We next reach certain items of costs, involved in the cross-appeal.
 
 
 69
 (1) The court allowed and taxed as costs in case No. 18404 but one proctor's docket fee of $20.00 on the trial, and a fee of $2.50 for each of the ten depositions admitted in evidence. This allowance followed the exact language of 28 U.S.C. 1923.
 
 
 70
 Cross-appellants rely on the last paragraph of Title Guaranty & Trust Co. v. Crane Co., 219 U.S. 24, 35, 31 S.Ct. 140, 142, 55 L.Ed. 72 (1910), where Mr. Justice Holmes, without discussion or reason, states:
 
 
 71
 'The allowance of a docket fee of $10 to each claimant appears to us to be correct. Rev.Stat. 824 * * *. The claims are several and represent distinct causes of action in different parties, although consolidated in a single suit.'
 
 
 72
 This. say cross-appellants, is the only case in point decided by the United States Supreme Court.
 
 
 73
 This circuit 'ruled to the contrary' (said the second circuit-- Petition of Skibs A/S Jolund, 302 F.2d 114 (1962)), in Boston Marine Ins. Co., v. Metropolitan Redwood Lumber Co., 197 F. 703 (9th Cir. 1912). Should the accident of forum determine what docket fees are to be awarded? supra, ask cross-appellants.
 
 
 74
 Cross-appellee relies on the Boston case, supra, and the cases this court therein relied upon: The Oregon, 133 F. 609 (9th Cir. 1904); Title Guaranty & Trust Co. v. Puget Sound Engine Works, 163 F. 168 (9th Cir. 1908); and The State of Missouri, 76 F. 376 (7th Cir. 1896).
 
 
 75
 We note that the Title Guaranty action was one to enforce claims of materialmen against a surety on a contractor's bond. There is doubt 'whether several parties were there represented by the same proctor' (Cross-Appellants' Reply Brief, p. 5).
 
 
 76
 Here they were. More important, we do not know whether all claimants joined in one libel in Title Guaranty, or filed separate libels. Cf.: The A. Moulton, 291 F. 95 (S.D.Fla.1923); The Mississippi, 20 F.2d 1015 (N.D.Cal.1927). Here we do know the various libellants did join in one libel. (Others were joined by stipulation.)
 
 
 77
 We are struck by the continued reference in the cases cited on this subject to the general rule that: 'Costs in admiralty are wholly within the control of the court, and are allowed upon equitable considerations.' The Oregon, supra; The State of Missouri, supra.
 
 
 78
 In admiralty proceedings, costs are allowed according to rules promulgated by the Supreme Court if Congress has not acted. 28 U.S.C. 1925.
 
 
 79
 Revised Statute 824, mentioned in the Title Guaranty case, supra, has become, with other sections 28 U.S.C. 1923. 'This simplified restatement provides for a single docket fee in each case which reaches final hearing or trial.' Revisor's Note, 28 U.S.C.A. 1923.
 
 
 80
 We think there is a reasonable distinction to be made between several libellants joined in one action and one libel, resulting in one judgment, and libels filed separately, and joined together for convenience of court or counsel at trial. We think one docket fee is prescribed and proper in the first instance, while separate docket fees might well be equitable and proper in the second instance. Steffens v. Steiner, 232 F. 862 (2d Cir. 1916); The John McDermott, 109 F. 90 (D.Conn.1901); Boston Marine Ins. Co. v. Metropolitan Redwood Lumber Co., 197 F. 703 (9th Cir. 1912); United States to Use of Hudson River Stone Supply Co. v. Venable Const. Co., 158 F. 833 (C.C.N.D.Ga.1904). And see case cited, 28 U.S.C.A. 1923, p. 713, n. 9, paras. 2, 5 et seq.
 
 
 81
 In view of the language of the cases and of 1923, we decline to interfere with the discretion exercised by the trial judge under the facts of this case.
 
 
 82
 B. (2) Cross-appellants also ask to recover $745.12 as costs of deposition copies. The clerk disallowed this item in toto, as being for copies (Clk's Tr. p. 247). The disallowance was sustained by the district court (Clk's Tr. pp. 264-65). This was because of local rule 15(B)(2)(b) that 'Counsel's copies (of depositions) are not taxable.'
 
 
 83
 Cross-appellants assert this is inequitable. They rely on Perlman v. Feldmann, 116 F.Supp. 102, 109-11 (D.Conn.1953). We approve generally of that case, but it is not an admiralty case (nor was Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 678 (9th Cir. 1963) cited by counsel, where we followed Perlman). Ordinary rules of Civil Procedure do not yet apply to proceedings in admiralty (Rule 81(a)(1), Fed.R.Civ.P.). And neither 28 U.S.C. 1925, nor 28 U.S.C. 1923, nor General Admiralty Rule 44 require an answer different from that made by the trial court. We refuse to change it.
 
 
 84
 The judgment is affirmed in all respects.
 
 
 
 [1]
 '(24) That at all times subsequent to September 17, 1956, the City was in possession of and operating said pipeline to the extent necessary to keep and maintain said wharf facilities including Berths 195 to 198, in a good and safe condition of repair, and was obligated as owner of said wharf facilities to supervise, inspect and observe in the uses to which said pipeline was being put and in the bunkering operations which were being undertaken at the time of the oil spill to the extent necessary to keep said wharf facilities in a good and safe condition of repair at all times and to do likewise with said pipeline. The City breached each and all of its aforesaid duties, and as a proximate result thereof, the damages alleged by libelant and, if any, by the City, were sustained
 '(25) That at the time the oil escaped, said pipeline was defective in the following specific respects, inter alia, each of which was a direct and proximate cause of the failure of said pipeline, of the oil spill, and of the damage to the libelant (and the damage, if any, to the City) caused by such spill:
 '(a) The pipeline and its fittings, and specifically said coupling, could not contain the oil under normal conditions of use.
 '(b) The Style 38 Dresser coupling, which Gerwick installed in said pipeline in accordance with specific authorization and instructions of the City, was not suitable for use in said pipeline.
 '(c) The pipeline lacked any properly located expansion joint or joints.
 '(d) The pipeline lacked blocking, bracing and construction such as to enable it adequately to resist the tendency to separate at the coupling.
 '(26) That the aforesaid defects in the pipeline, and its failure, the oil spill and the damage to the libelant (and the damage, if any, to the City), caused by such spill, were proximately caused and contributed to by negligence on the part of the City generally, and in the following specific respects, inter alia:
 '(a) The City, in drawing up its plans and specifications for this construction, failed to calculate the factors which would indicate the correct number and location of expansion joint(s), although such calculations were both indispensable and good engineering practice.
 '(b) The said plans were deficient in that the 'detail special pipe clamp', set forth on City Plan 1-110-62 (Exhibit 'F' on trial) necessarily hampered-- not helped-- the proper functioning of the expansion joint which was to be placed between its members, by holding the pipeline rigid; moreover, it could not accommodate a suitable expansion joint.
 '(c) The detail on the City plan referred to in subparagraph (b) above was inadequate in that the specifications therein set forth were irreconcilable, under normal engineering practice, with the installation of a standard expansion joint, and were even confusing to the Chief of the Design Section of the City Harbor Engineering Department, from whence they issued.
 '(d) The City plans, specifications, piping plans and drawings for this construction were not fit for the purpose intended in that they failed to set forth what type of an expansion joint was to be installed at the point where the line separated, or any detail whatsoever concerning it, except its location.
 '(e) The City's engineering for this construction was inadequate and not in accordance with reasonable engineering practices or standards, in that the City made no calculations to determine to what forces the pipeline would be subject under conditions of normal use or otherwise, or as to whether it would withstand same safely.
 '(f) The City's plans, specifications, piping plans and drawings were not fit for the purpose intended in that there was a general lack of engineering detail in said plans, specifications, piping plans and drawings provided by the City for the construction of said pipeline.
 '(g) After oral inquiry by Gerwick, and with the knowledge of the City, a Style 38 Dresser coupling was installed, the expansion capacity of which was severely limited, and was not suitable to said pipeline.
 '(h) In spite of its knowledge that a Style 38 Dresser coupling was installed in said pipeline, the City never removed or ordered said coupling removed from the line.
 '(i) The City failed to install or have installed on said pipeline a yoke, anchor lugs or other similar contrivance to prevent the pipe ends slipping out of the coupling.
 '(j) The hydrostatic tests conducted on said pipeline were observed by said City Inspector Jackson and by Gerwick's supervisory personnel; said pipeline twice failed those tests by parting at the Dresser coupling, as was then known to the City. Those failures were clear warning to the City that said pipeline was inadequate for its normal intended use, particularly at the location of said coupling.
 '(k) Contrary to reasonable engineering practices or standards, no adequate redesign or reconstruction took place.
 '(l) The City knew or should have known, from the failures of said pipeline at the coupling during the hydrostatic tests, that said pipeline was not fit or safe for its normal intended use, in that, among other things, in the City's opinion, the use of temporary blocking rendered the last test unsatisfactory.
 '(m) The City knew or should have known, at the time of the hydrostatic tests that said pipeline was defective, in that the success of the last test was only due to the installation of temporary thrust blocking by Gerwick, and the City then knew or should have known that said pipeline would separate at said coupling under conditions of normal intended use if said temporary thrust blocking were removed without adequate replacement.
 '(n) The City ordered the removal of the thrust blocking installed by Gerwick, and it was removed not later than the day after the last test, i. e., on or about September 14, 1956, without providing, then or thereafter, an adequate replacement for same.
 '(o) Although the City claimed it considered the writing mentioned in Finding (14), which it received from Gerwick, to be ambiguous, it never made any subsequent inquiry with any of the Gerwick personnel to resolve the claimed ambiguity.
 '(p) When the City later designed and installed its own bracing in late May 1957 pursuant to Exhibit 'R' on trial, said bracing failed to provide adequately against the very type of axial movement which the hydrostatic tests had shown to be present in said pipeline and to be the reason for the test failures, which the City then knew or should have known.
 '(q) Said City's bracing was accordingly defective.
 '(r) Contrary to reasonable engineering practices or standards, after the installation of its own bracing, the City totally failed to test said pipeline hydrostatically or in any other way in the condition under which it was to be operated, or otherwise, prior to permitting its use in actual operation.
 '(s) Contrary to reasonable engineering practices or standards, the City failed to observe said pipeline and particularly said coupling upon its first or subsequent use or uses in actual operation prior to or at the time of the oil spill.
 '(t) The City accepted said pipeline construction from Gerwick prior to the oil spill, including said Style 38 Dresser coupling, with knowledge of its dangerous and defective condition, as aforesaid.
 '(27) That there was no negligence on the parts of respondents, or either or any of them, with the exception of negligence on the part of the City, as herein set forth, either as alleged or otherwise or at all.' (Clk's Tr. pp. 82-87, No. 18404.)
 
 
 [2]
 The City urges that since the amount of actual damages suffered was stipulated to, an allowance of interest thereon 'would result in the boat owners or their subrogees recovering damages in an amount greater than those they agreed they had suffered.'
 
 
 [3]
 The City's position seeks to nullify the effect of Finding of Fact 18 (Clk's Tr., p. 231, No. 18404) by shifting the burden of proof to plaintiffs
 
 
 [4]
 '5. The line required one or more expansion joints at or about Bents Nos. 221 and 222. (App.Op.Br. p. 6.)
 '6. After installing the Style 38 Dresser coupling in the line at this point, the line was hydrostatically pressure tested (i. e., by pressure testing it with water) in accordance with the requirements of the contract, which required the line to sustain a test pressure of 400 pounds per square inch. (Finding (11).)
 '7. The pipeline failed the first test on September 11, 1956, by separating at the coupling at a pressure of 200 pounds per square inch. Both the City and Gerwick knew this. (App.Op.Br. p. 8; Findings (11) and (26)(j).)
 '8. The pipeline was then reassembled at the coupling and the next day a second test was performed and again the pipeline separated at the coupling. The City and Gerwick knew this also. (App.Op.Br. pp. 8-9; Findings (11) and (26)(j).)
 '9. The pipeline was again reassembled at the coupling, and this time threaded bolts were placed through coupling and attached to anchor clips welded on each side of the pipe both north and south of the coupling, to hold the pipe securely in the coupling. Additionally, timber thrust blocking was placed at the first right angle turn in the pipeline just north of the coupling, to prevent the pipe 'kicking out' of the coupling when pressure was applied. Again a hydrostatic test was run, and this time the pipeline held a pressure in excess of 400 pounds. (App.Op.Br. pp. 8-9; Findings (12) and (26)(m).)
 '10. Gerwick then inquired of City what it wanted done respecting the above-mentioned devices used to enable the pipeline to pass the pressure test. (App.Op.Br. p. 9.) At the City's instructions, the thrust blocking, anchor clips and bolts were all removed. (App.Op.Br. p. 9; Findings (13) and (26) (n).)
 '11. Thereafter by letter dated October 11, 1957 (Exhibit 16, perhaps the most significant exhibit in a rather extensive series of exhibits), Gerwick's superintendent and project engineer specifically advised the City's Harbor Engineer that the blocking necessary successfully to pressure test the ten-inch oil pipeline had been removed, even though the Gerwick supervisor considered such blocking to be imperative to the safety of the line, because without it the line would separate at the coupling under conditions of normal use. (Finding (14).) In fact, the City's own inspector told this to his superior (R.T. 560).
 '12. The City received such letter, the Chief Harbor Engineer and his assistant discussed it, and thereafter the City did nothing until May of 1957. (App.Op.Br. p. 10.) At that time, the City installed sway bracing at Bent No. 225 on the ten-inch oil pipeline which was markedly different in characteristics and effect from the thrust blocking Gerwick had previously installed when the pipeline passed the pressure test, and which had thereafter been removed at the City's request. (Findings (15) and (26)(p) and (q).)
 '13. The City did not again hydrostatically pressure test the line after it put in this new bracing and before the line was put in operation (Finding (26) (r).), nor did the City even observe the line or the coupling upon its first and subsequent uses in actual operation. (Finding (26)(s).)
 '14. After being put in operation, the pipeline was used precisely four times for bunkering ships with oil north of Bent No. 213, commencing on July 3, 1957. On the fourth such use on July 11th, the pipeline separated at the coupling and spilled some 1600 barrels of fuel oil into the waters of Los Angeles Harbor. (Findings (16) and (17).)' (Brief for Appellees and Cross-Appellant, pp. 5-7.)
 
 
 [5]
 The California courts will. C.C.P. 1875, subd. 3. Teachout v. Bogy, 175 Cal. 481, 485, 166 P. 319 (1917); Taylor v. Los Angeles, 180 Cal.App.2d 255, 4 Cal.Rptr. 209 (1960); Thompson v. Los Angeles, 82 Cal.App.2d 45, 47, 185 P.2d 393 (1947)
 
 
 [6]
 Gerwick agreed to indemnify the City for his own defective work-- i. e., improper methods or negligence. But the City chose not to put the tested end-result, as created by Gerwick, to any subsequent tests. It removed Gerwick's solution and substituted its own
 
 
 [7]
 This is a different point from cross-appellants' complaint, with respect to deposition costs not allowed
 
 
 [8]
 This language here twice used in parentheses is not in the stipulation, but we read it in as expressing the intent of the parties, and confirmed the accuracy of our interpretation in oral argument
 
 
 [9]
 'In the event that libelants prevail, libelants will be entitled to recover these amounts for damage to said vessels plus interest and costs to the extent allowed by the court in accordance with law
 'The execution of this stipulation shall not be deemed to constitute a liquidation of libelants' damages for the purpose of computing or allowing interest thereon, and interest, if any, that the same would be awarded in the event this stipulation had not been made and the case had proceeded to trial and the damages determined therein.' (Clk's Tr., p. 112, No. 18404.)
 
 
 [10]
 Before the trial of these cases, the court insisted as a condition of consolidating the trials that the parties agree on the amount of damages sustained by each libellant. The court stated that, in the absence of such a stipulation, it would try each of the cases separately. Such a proceeding would necessarily have included a trial on the issue of the amount of damages sustained by the cross-appellants. In accordance with the decisions discussed above, in order for the court to determine the amount of damages sustained by each of the cross-appellants, evidence would have been required to determine the amount of damage to the vessel or harbor installation stained as a result of the oil spill; whether the damage had been repaired; whether the costs of repair had been paid and if so when; whether there was any loss of use as a result of the damage; whether at the time of the casualty the vessels were in need of painting and the oil spill was merely a fortuitous event which provided them with the cost of painting, which painting they had planned to do in any event